S. N. NIELSEN COMPANY, Plaintiff-Appellant, *v.* NATIONAL HEAT & POWER COMPANY, INC., Defendant-Appellee.

(No. 60219;

First District (4th Division)—October 8, 1975.

Kai Allen Nebel, N. A. Giambalvo, and Wayland B. Cedarquist, all of Chicago (Boodell, Sears, Sugrue, Giambalvo & Crowley, of counsel), for appellant.

Robert L. Tarrel, of Chicago (Sidney Z. Karasik and Gary E. Dienstag, of counsel), for appellee.

Mr. JUSTICE BURMAN delivered the opinion of the court:

The S. N. Nielsen Company (hereinafter referred to as Nielsen), a general contractor, brought this action to recover damages from National Heat & Power Company (hereinafter referred to as National), a subcontractor, for an out-of-pocket loss of $101,248 arising out of the withdrawal of National's bid to perform certain work on a project in which Nielsen had been awarded the general contract. The trial judge, sitting without a jury, entered judgment in favor of National, and Nielsen appeals.

On appeal it is contended that (1) Nielsen is entitled to recover damages under the doctrine of promissory estoppel; (2) there is no evidence to support the court's holding that a mistake was committed which excused National from its duty to perform; (3) the court erred in holding there was no contract between the parties; and (4) the judgment is against the manifest weight of the evidence.

The facts which gave rise to this action may be summarized as follows: In July of 1969 Nielsen was invited to bid as a general contractor on the second construction phase of the Budd Company plant. Sets of drawings and specifications were provided by Giffels and Rossetti, the architect. Thereafter, Nielsen contacted a number of subcontractors as well as material and labor suppliers. Bids from approximately 25 mechanical subcontractors were solicited including National. National had previously submitted bids to Nielsen, but they were never accepted. National accepted the invitation to bid, and copies of the drawings and specifications dealing with the mechanical work were provided. On several occasions

National contacted the architect to clarify questions regarding the mechanical phase of the project.

On August 4 National contacted Nielsen by telephone and submitted an oral bid of $494,000. Later that day Nielsen submitted its final bid on the Budd Company project. The following day Budd informed Nielsen that it had been awarded the general contract. Nielsen in turn informed National that it would be the mechanical subcontractor. On August 18 National reconfirmed its bid by letter. That same day Nielsen submitted to the architect the names of all proposed subcontractors, including National.

On August 20, 1969, the Budd Company and Nielsen executed a formal written contract. One provision of the contract provided as follows:

> "5.2.3 The Contractor shall not contract with any Subcontractor * * * for the principal portions of the Work who has not been accepted by the Owner and the Architect * * *."

On August 28 Nielsen received a letter from the architect indicating that it was withholding approval of National as the mechanical subcontractor pending a determination of National's fiscal responsibility and performance on previous projects. Nielsen transmitted this information to National by letter dated September 2, 1969, and requested a list of projects completed by it. Three days later Nielsen sent a "letter of intent" to National granting authority to proceed with its subcontract, "[s]ubject to approval of the Architects and Owner." The letter further stated, "Formal contract will be issued in the very near future." A formal contract was never delivered to National.

On September 17, 1969, Nielsen received a telegram from National stating that it was unable to enter into a contract with them. It further recited, "Circumstances have arisen since our submitting a quotation on August 18, 1969 which prevents us from entering into this project and thus we are withdrawing our bid." On December 4, 1969, Nielsen filed this action against National for out-of-pocket losses incurred as a result of National's withdrawal of its bid.

Initially, Nielsen claims that it is entitled to recover damages under the doctrine of promissory estoppel. Nielsen points out that its initial bid on the Budd project was $5,284,113; however, upon receiving National's bid, it reduced its offer to Budd by $200,000. Nielsen argues that on the basis of this action in reliance it is entitled to invoke the doctrine of promissory estoppel.

The elements of promissory estoppel are set forth in section 90 of the Restatement Contracts (1932), which states:

> "A promise which the promisor should reasonably expect to

induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."

There exists some early authority to the effect that the doctrine of promissory estoppel is inapplicable to commercial transactions. (*E.g., James Baird Co. v. Gimbel Bros.* (2d Cir. 1933), 64 F.2d 344.) Such cases generally hold that the doctrine is intended only to enforce expressions of donative intent. However, the prevalent view now appears to bring commercial transactions within the purview of the doctrine, and it can be safely said that promissory estoppel applies to cases involving bids on construction projects. (*S. M. Wilson & Co. v. Prepakt Concrete Co.,* 23 Ill.App.3d 137, 318 N.E.2d 722.) In any event, while the courts have applied the doctrine with increasing willingness, they have never lost sight of its underlying purpose: to protect innocent parties. Thus, it has been held that in order to invoke the doctrine of promissory estoppel in the instant type of situation, the reliance must be reasonable and justifiable. (*Robert Gordon, Inc. v. Ingersoll-Rand Co.* (7th Cir. 1941), 117 F.2d 654; *N. Litterio & Co. v. Glassman Construction Co.* (D.C. Cir. 1963), 319 F.2d 736.)

The thrust of National's response to Nielsen's contention is that Nielsen was not justified in relying on its bid, particularly since Nielsen was not such an innocent party. National argues that its bid resulted from an error in calculation and that Nielsen knew or should have known of the mistake. The trial judge agreed and specifically found as follows:

"9. That while this case can be disposed of on the ground that there was no contract as contemplated by the parties, the bid of the defendant was based upon a mistake which justified rescission;

10. That the differential between National's bid and the next lowest bid was so great as to alert plaintiff to the existence of the mistake;

11. That the mistake was in part induced by lack of clarity in the plans and specifications upon which defendant prepared its bid;

12. That there is evidence in the record to show that the Architect and other bidders were aware of the necessity of clarifying the specifications;

13. That Nielsen, by offering defendant an additional $100,000, evidenced knowledge on its part that defendant's bid was a mistake;

❋   ❋   ❋

15. That plaintiff's act in changing its position by reducing its bid to the owners by $200,000 was not justified, considering that defendant's bid at all times was subject to 'clarification of the plans and specifications' and such fact was known to the plaintiff."

Upon review of the record we find ample evidence to support these findings.

The evidence discloses a disparity of $286,000 or nearly 50% between defendant's bid and that of Conry, the only other contractor who bid on the same scope of work. Nielsen was familiar with Conry and had prior successful dealings with that firm. The record further discloses that Donald Wagner, Nielsen's manager, admitted that the National bid would have been unusual were it not for the fact that he believed National's estimator "knew what he was doing." The trial judge stated, however, that Wagner's testimony was unbelievable and that he was under the impression that Wagner knew and perhaps had a very deep suspicion that National's estimator committed a blunder.

Moreover, the record is replete with actions by National to obtain clarifications of the mechanical plans and specifications. We note also that National was not the only bidder who had difficulty with the plans. There were many outstanding questions including the valve arrangement of some of the equipment. In fact, questions concerning the dynamite filter, the oil storage tank, and the piping remained unanswered by the architect at the time National prepared its bid. Subsequently, National discovered a major error with regard to the piping valves and filtering oven which affected the labor cost and increased the price by $200,000. Accordingly, National withdrew its bid.

The instant case is strikingly similar to that of *Union Tank Car Co. v. Wheat Bros.* (1964), 15 Utah 2d 101, 387 P.2d 1000, wherein the general contractor, by reason of a disparity in bids, was held to have known that the subcontractor erred in computing its bid. In refusing to apply the doctrine of promissory estoppel, the court stated:

> "Plaintiff also knew that there was a great disparity (about 35%) between Wheats' price and the next lowest bid. Yet, notwithstanding these facts, and that although Sonderegger called twice to verify the price, he did not discuss nor mention this important fact concerning the extra high price of the phenoline paint." 15 Utah 2d 101, 105, 387 P.2d 1000, 1003.

The court further noted that, as in the case at bar, the mistake was largely one of the plaintiff's own making.

The rule espoused in *Union Tank Car Co. v. Wheat Bros.* also is supported by Professor Williston, who states:

> "The fundamental basis for the estoppel is the justifiableness of

the conduct of the party claiming the estoppel. His reliance is equally justifiable whether the party estopped knows or does not know all the collateral facts bearing on the matter, *provided that he himself does not know such facts which he fails to disclose."* (Emphasis added.) 5 Williston on Contracts § 692, at 321 (3d ed. 1961).

■■ We hold that the trial court properly refused to apply the doctrine of promissory estoppel because Nielsen knew, or should have known, of the obviously mistaken bid by National. Consequently, such reliance as Nielsen claims it placed on National's bid was as a matter of law not reasonable. The case of *Drennan v. Star Paving Co.* (1958), 51 Cal.2d 409, 333 P.2d 757, relied upon by Nielsen is clearly distinguishable on the facts. There the general contractor had no reason to know of the subcontractor's mistake in computing its bid. The court expressly stated that if the general contractor had reason to believe that the bid was in error, he could not justifiably rely on it. Nor was there an issue of mistake in *Multi Electrical Manufacturing Co. v. Lipman Construction Co.,* 307 Ill.App. 224, 30 N.E.2d 136, also cited by Nielsen.

More important is the question of whether there was a binding oral contract between the parties. Initially, we note that Nielsen was always in a position to refute National's bid. The architect, who reserved the right to approve or disapprove any subcontracts, had expressly informed Nielsen that it was withholding approval of National as the mechanical subcontractor. Subsequently, Nielsen issued a letter of intent to National constituting authority to proceed "[s]ubject to approval of the Architects and Owner." It appears to us that said approval was understood to be a condition precedent to the formation of any contractual relationship. It is undisputed that at the time National withdrew its bid, the architect had not granted its approval.

■■ Moreover, the law is clear that where the parties make the reduction of an agreement to writing and its signature by them a condition precedent to its completion, it will not be a contract until that is done. (*Baltimore & Ohio Southwestern R.R. Co. v. People ex rel. Allen,* 195 Ill. 423, 63 N.E. 262.) Of course, whether such is the intention of the parties is a question of fact to be determined by the trial court. In the case at bar the trial court specifically found that "the parties contemplated a written, not an oral agreement." Upon review of the record, we find ample evidence to support this conclusion.

Conry was a mechanical subcontractor who had originally bid $780,000 on the same scope of work as National. When National withdrew its bid of $494,000 Conry submitted a bid of $735,000. Within eight days, Conry

had a formal written subcontract in its possession. The trial court observed with respect to the Conry agreement as follows:

> "I've read this subcontract in its entirety and it contains so many agreements which in my opinion are absolutely essential to the performance of this job; that it would be, in my opinion, extremely unlikely that either Nielsen or National intended themselves to be contractually bound to each other until this particular written subcontract form had been completed and signed by both parties. There are many matters that go far beyond the bid price."

There is other evidence in the record to substantiate the court's finding; however, on this basis alone we are satisfied that the parties intended to be bound only by a formal written agreement for their mutual protection.

■■ The case of *Traff v. Fabro*, 337 Ill.App. 83, 84 N.E.2d 874, relied on by Nielsen, is readily distinguishable. In that case there was no evidence that the subcontract was subject to approval by a third person nor any evidence that the parties intended a formal written contract. We must bear in mind the proposition that a reviewing court indulges in every presumption as to the correctness of the trial court's judgment. And in connection with a factual question, a judgment will not be disturbed upon review unless the determination is so manifestly against the weight of the evidence as to compel a contrary conclusion. We cannot say that the judgment of the trial court is manifestly against the weight of the evidence. The contrary is true. Accordingly, for the reasons stated, the judgment is affirmed.

Judgment affirmed.

DIERINGER, P. J., and JOHNSON, J., concur.