**DAVID COPPERFIELD'S DISAPPEARING, INC., a Nevada corporation, and David Copperfield, Plaintiffs–Appellees,**

v.

**HADDON ADVERTISING AGENCY, INC., an Illinois corporation, and Cash Station, Inc., an Illinois corporation, Defendants–Appellants.**

No. 89–1198.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 13, 1989.

Decided March 13, 1990.

Burton Joseph, Carol Johnson, Edward S. Lichtenstein, Daniel L. Dreiser, Barsy, Joseph & Lichtenstein, Jack Joseph, Joseph & Myers, Chicago, Ill., for plaintiffs-appellees.

David B. Goroff, Mark Crane, John L. Conlon, Hopkins & Sutter, Chicago, Ill., for defendants-appellants.

Before EASTERBROOK and MANION, Circuit Judges, and GRANT, Senior District Judge.*

GRANT, Senior District Judge.

David Copperfield and his corporate identity, David Copperfield's Disappearing, Inc., brought suit against the defendants, Haddon Advertising Agency, Inc. and Cash Station, Inc., alleging that they breached an agreement to pay for Copperfield's appearance in an ad campaign for Cash Station. Following a jury verdict in favor of Mr. Copperfield, the defendants filed a motion under Fed.R.Civ.P. 50(b) for judgment notwithstanding the verdict. It is the denial of that motion which forms the basis of this appeal.

## I. *FACTS*

Defendant, Cash Station, Inc., is a not-for-profit Illinois corporation in the business of providing electronic funds transfer services to bank customers through automatic teller machines. In late 1986, Cash Station merged with the Money Network, which also provided electronic funds transfer services. The merged entity was to be renamed "Money Station, Inc."

In order to publicize the merger, Cash Station engaged the advertising services of the defendant Haddon Advertising Agency, Inc. ("Haddon"). Haddon conceived and presented to Cash Station an advertising campaign featuring the well-known magician-illusionist, David Copperfield.

In December 1986, Haddon contacted Copperfield's attorney and business representative, Albert Rettig, to inquire about Copperfield's availability and fee for an ad campaign. Rettig subsequently notified Haddon that Copperfield was available and that he would charge $125,000 for a television commercial; $150,000 for a commercial and local print ads; and, $175,000 for a

---

* Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is     sitting by designation.

television commercial, print advertisement and a personal appearance.

On March 27, 1987, James Dugan, Haddon's Associate Creative Director, telephoned Rettig to tell him that Cash Station had approved the campaign and Copperfield's fee, which at that time included Copperfield's appearance in television and print commercials as well as a personal appearance. Dugan and Rettig also discussed Copperfield's schedule and general availability and the need for a written contract.

On March 31, 1987, Dugan sent Rettig a letter reviewing their fee discussions of March 27; acknowledging that the still shots for the print campaign and filming of the television commercials could be completed in Los Angeles between May 11 and May 24 to accommodate Copperfield's schedule; and tentatively scheduling a personal appearance in Chicago for July 7, 1987. Dugan also sent the script and story boards for the television commercial for Copperfield's approval. In his letter, Dugan stated, "Assuming that Mr. Copperfield approves the attached script, I would ask that you [Rettig] prepare the necessary contracts for the commercial and the personal appearance."

Copperfield did not approve of the script as presented, and requested a meeting with Haddon representatives to discuss proposed changes. The meeting took place on April 24, 1987, at which time Haddon agreed to modify the script, to employ Copperfield's technical advisor, Don Wayne, to help create the illusions which were to be performed, and to schedule preprogramming and actual production for May 20–22. It was also agreed that Copperfield and his stylist would shop for his wardrobe prior to the preprogramming meeting on May 20.

Copperfield and his staff began working on the Cash Station project immediately following the April 24 meeting, creating the illusions for the commercial and putting aside work on a CBS television special. Haddon also began work on the project, selecting the production company and preparing for preprogramming and actual production.

Cash Station gave its final approval to the revisions in the script and storyboard in early May. At some point thereafter, for reasons not clear to the court, Haddon assumed the responsibility for drafting the written contract for Copperfield's services.

The first draft of the contract was delivered to Rettig on Friday, May 15, 1987, five days before preprogramming and production were to commence. In a letter which accompanied the draft, Jacqueline Wagner, a Vice President at Haddon, apologized for the delay in forwarding the contract and expressed Haddon's pleasure at having acquired Copperfield as the spokesperson for the new Money Station.

The contract submitted embodied the terms which had previously been agreed upon, including the nature of the services to be performed, the compensation to be paid, the place and dates of performance, and other particulars. Section 8 of that contract captioned *Compensation*, provided:

(a) In consideration of the services of Copperfield and for the rights, properties and privileges vested in Agent hereunder, Agent on behalf of [Money Station of Illinois, Inc.] shall pay to Copperfield as full compensation the sum of one hundred fifty thousand dollars ($150,000) which amount includes any fees to Copperfield's agent.

(b) The Compensation payable to Copperfield pursuant to Subsection 8(a) of this Agreement shall be paid in two installments as follows:

(i) $50,000 upon the execution of this Agreement; and

(ii) $100,000 upon the completion of production of the television commercial, videotape and still photographs.

The contract also provided that Copperfield would assume his pension and welfare costs; that Illinois law would govern the contract; and that all breach of contract actions would be settled by arbitration— terms which had not been discussed or agreed upon by the parties.

Rettig telephoned Wagner the following day concerning the additional terms. He

proposed to make certain changes which he considered "incidental," namely:

> (a) that the law of Nevada or California rather than the law of Illinois control the agreement;
> (b) that time and geographic limitations be inserted in the noncompetition clause;
> (c) that a clause be inserted granting Copperfield power to approve scripts, storyboards, copy and layout;
> (d) that Haddon pay for the pension and welfare expenses which were generated to Copperfield by reason of the agreement;[1] and,
> (e) that Haddon agree to indemnify Copperfield against any potential lawsuit for the running of the advertisement.

Although Wagner was unwilling to commit to the proposed revisions over the telephone, neither she nor Rettig ever suggested that performance would not proceed as scheduled.

The parties had not reached an agreement as to the outstanding provisions when, on May 18, 1987, Cash Station learned that it did not have rights to the name "Money Station." As the ad campaign was based upon the concept that words from the names of Cash Station and Money Network would be used to "magically" become Money Station, the loss of the name was, in the defendants' opinion, fatal to the ad concept.

Wagner telephoned Rettig on May 18 to advise him that the commercial was not going to proceed as scheduled. Rettig and Copperfield, however, were not advised until late May, or early June, that Haddon and Cash Station had decided to drop the campaign altogether.

On December 2, 1987, Copperfield filed suit against Haddon and Cash Station for breach of contract. In addition to the facts previously elicited, Copperfield presented evidence that it was common practice in the entertainment industry, given time constraints, for execution of a formal written contract to come two or three months after an entertainer's services have been rendered.

Haddon and Cash Station moved for directed verdicts at both the close of the plaintiffs' case and at the conclusion of all the evidence. Fed.R.Civ.P. 50(a). The motions were denied, and the case was submitted to the jury, which ultimately returned a verdict for Copperfield and awarded him $154,000 in damages. Haddon and Cash Station thereafter filed a Rule 50(b) motion for judgment notwithstanding the verdict. The motion was denied, and this appeal followed.

## II. STANDARD OF REVIEW

In reviewing a district court's decision to deny a motion for directed verdict or a Rule 50(b) motion for judgment notwithstanding the verdict, we look at the evidence in a light which is most favorable to the prevailing party, and determine whether the evidence, combined with all reasonable inferences which may be derived therefrom, supports the jury's verdict. *Erwin v. County of Manitowoc*, 872 F.2d 1292, 1295 (7th Cir.1989); *Panter v. Marshall Field & Co.*, 646 F.2d 271, 281 (7th Cir.), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981). The question is "not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." *Gunning v. Cooley*, 281 U.S. 90, 94, 50 S.Ct. 231, 233, 74 L.Ed. 720 (1930) (*quoting Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448, 20 L.Ed. 867 (1871)). *See also VanHoudnos v. Evans*, 807 F.2d 648, 650 (7th Cir. 1986); *Hohmann v. Packard Instrument Co.*, 471 F.2d 815, 819 (7th Cir.1973). A motion for judgment notwithstanding the verdict thus raises a question of law, for which our review is *de novo*. *Webb v. City of Chester, Illinois*, 813 F.2d 824, 827 (7th Cir.1987); *McMahon v. Eli Lilly and Company*, 774 F.2d 830, 832 (7th Cir.1985).

---

1. Copperfield contends that this provision was in accordance with the mandatory and unwaivable provisions of the Screen Actor's Guild contract which provides that the producer and/or advertising agency is responsible for pension and welfare contributions, and that Haddon's provision to the contrary was therefore unenforceable.

## III. *CONCLUSIONS*

▉ Jurisdiction in the present case was based solely on diversity of citizenship, and the parties agree that Illinois law controls the substantive issues presented. The central dispute is whether the parties intended the execution of a written contract to be a condition precedent to a binding and enforceable contractual relationship, or whether the proposed writing was intended only to formalize the terms already agreed upon. Although the intent of the parties to an oral contract is generally a question of fact, *Yorke v. B.F. Goodrich Co.*, 130 Ill. App.3d 220, 85 Ill.Dec. 606, 608, 474 N.E.2d 20, 22 (1985); *S.N. Nielsen Co. v. National Heat & Power Co.*, 32 Ill.App.3d 941, 337 N.E.2d 387, 391 (1975), it may become a question of law "if the facts are undisputed and there can be no difference in the judgment of reasonable men as to the inferences to be drawn from them." *Ceres Illinois, Inc. v. Illinois Scrap Processing, Inc.*, 114 Ill.2d 133, 102 Ill.Dec. 379, 383, 500 N.E.2d 1, 4 (1986) (*quoting Yorke*, 85 Ill.Dec. at 608, 474 N.E.2d at 22).

The defendants contend that the evidence presented at trial supported but one conclusion, that the execution of a written contract was a condition precedent as a matter of law. They maintain that the only offer made was the written offer that Haddon submitted on May 15; that Rettig rejected that offer when he proposed modifications that Haddon never accepted; and, that the defendants were therefore entitled to judgment in their favor notwithstanding the verdict. We cannot agree.

▉ The following factors are considered "persuasive" in determining whether the execution of a written contract was intended as a condition precedent: (1) whether this is the type of business arrangement that is reduced to writing; (2) whether the amount of money involved was substantial; (3) whether significant provisions were not previously discussed or agreed upon; and (4) whether the parties' negotiations show that a writing was anticipated. *W.T. Grant Co. v. Jaeger*, 224 Ill. App. 538, 546 (1922). Although there were references to the need for a written con-

tract, a formal contract was never executed. The parties' conduct and statements following their oral agreement were therefore relevant to the question of whether a binding contract ever came into existence. *Ceres Illinois*, 102 Ill.Dec. at 384, 500 N.E.2d at 5; *Knightsbridge Realty Partners, LTD.–75 v. Pace*, 101 Ill. App.3d 49, 56 Ill.Dec. 483, 487, 427 N.E.2d 815, 819 (1981).

▉ The evidence presented at trial showed that at the conclusion of the meeting between Copperfield and Haddon representatives on April 24, 1987 the parties had agreed upon the essential terms of their contract, subject only to Cash Station's approval of the changes in the script and storyboards which Copperfield had suggested. That approval came in early May, prior to the defendants' decision to terminate performance. By the end of March 1987, Cash Station had approved the ad campaign proposed by Haddon and had agreed to pay Copperfield's fee. The offer of employment was communicated to Albert Rettig, Copperfield's attorney/agent on March 27, 1987, and was accepted the same day. The specifics of the campaign and the respective responsibilities and duties of the parties, including the nature of the illusions to be performed, the production staff, and the timing of performance, were agreed upon by Copperfield and Haddon by the end of April and by Cash Station in early May. Indeed, both Copperfield and Haddon began performance under the terms of their oral agreement following the meeting on April 24.

In Wayne's letter of May 15, 1987, which accompanied the first draft of the written contract, Haddon communicated its pleasure in having acquired Copperfield as a spokesperson for the new Money Station, and apologized for the delay in forwarding a written contract. Neither Copperfield nor the defendants, however, ever expressed an intention to postpone or delay performance until after the execution of a written contract. To the contrary, Copperfield presented evidence that it was customary in the entertainment industry for the execution of a formal contract to come

several months after performance had occurred. Under Illinois law, parties to an agreement are bound by the usages of the trade in which they are mutually engaged and are presumed to have contracted with reference to, and knowledge of, those usages.[2] *Burley v. Elgin, Joliet & Eastern Railway Co.*, 140 F.2d 488, 490 (7th Cir. 1943), *aff'd*, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945).

Based on the evidence presented at trial, the jury could have reasonably concluded: (1) that by the end of April or early May 1987 the parties had reached an oral agreement to employ Copperfield in an advertising campaign, and had assented to the essential terms of that agreement; (2) that the references to a future written contract did not negate the existence of a present contract; and (3) that a formal written contract was to be prepared only as a memorialization of the oral agreement. Under such circumstances, "the bargain is binding even though the document has not been executed." *Ceres Illinois*, 102 Ill. Dec. at 384, 500 N.E.2d at 5. *See also Chicago Investment Corp. v. Dolins*, 107 Ill.2d 120, 89 Ill.Dec. 869, 872, 481 N.E.2d 712, 715 (1985); *Baltimore & Ohio Southwestern Railway Co. v. People ex rel. Allen*, 195 Ill. 423, 63 N.E. 262, 263 (1902).

For the foregoing reasons, the decision of the district court denying the defendants' motion for judgment notwithstanding the verdict is AFFIRMED.

---

**2.** Ill.Rev.Stat. Chap. 26, ¶ 1–205(2) and (3) define "usage of trade" as follows:

(2) A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts....

(3) A course of dealing between the parties or any usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware give particular meaning to and supplement or qualify terms of an agreement.