FIRST NATIONAL BANK IN STAUNTON, Plaintiff-Appellee, v. McBRIDE CHEVROLET, INC., *et al.*, Defendants-Appellants.

Fourth District   No. 4—94—0052

Argued August 23, 1994.—Opinion filed October 14, 1994.

Mark C. Goldenberg (argued), Elizabeth V. Heller, and William A. Kohlburn, all of Bono, Goldenberg, Hopkins & Bilbrey, P.C., of Granite City, for appellants.

Ronald L. Pallmann (argued), of Suelthaus & Kaplan, P.C., of Belleville, for appellee.

JUSTICE KNECHT delivered the opinion of the court:

Plaintiff First National Bank in Staunton (Bank) brought an action to foreclose upon loans made to defendant McBride Chevrolet, Inc., and mortgages and personal guarantees executed by defendants John Michael McBride and Verda McBride (McBrides) to secure the corporation's loans. Defendants filed counterclaims and affirmative defenses alleging the collapse of the corporate business, and resulting

defaults on the notes and mortgages, was caused by the wrongful acts of the Bank returning a check from the defendant corporation due to insufficient funds, when one of plaintiff's officers had told defendants the check would be held to await a deposit to make the check good.

The court ruled defendants' counterclaims and affirmative defenses were barred by the Illinois Credit Agreements Act (Act) (815 ILCS 160/0.01 *et seq.* (West 1992)), and granted plaintiff's motions to dismiss the counterclaims and strike the affirmative defenses. Plaintiff's motion for summary judgment on the corporation's loans, the personal guarantees, and for foreclosure of the property securing the loans was granted. Defendants then filed an appeal with this court arguing the trial court's dismissal of their counterclaims and striking of their affirmative defenses was error since plaintiff's promise to hold a check was not a "credit agreement" within the meaning of the Act.

For purposes of this appeal of the dismissal of defendants' counterclaims and striking of their affirmative defenses, the well-pleaded facts of their counterclaims and affirmative defenses are taken as true. *Burdinie v. Village of Glendale Heights* (1990), 139 Ill. 2d 501, 505, 565 N.E.2d 654, 657.

Pursuant to a dealership agreement with General Motors, the McBrides owned and operated McBride Chevrolet, Inc., in Staunton, Illinois, beginning in 1969. They also at some time entered into an arrangement with General Motors Acceptance Corporation (GMAC) for financing. GMAC had a policy which provided if a dealer delivered a check to GMAC which was returned for insufficient funds, GMAC had a right to—and as a routine course of business did—terminate its relationship with the dealer. Such a termination would effectively destroy the business and eliminate the income of the owners of the dealership. Rory Makler, an officer of the Bank, and the Bank were aware of this policy.

From 1970 on, the defendant corporation and the McBrides had an ongoing business relationship with plaintiff. Plaintiff provided business loans to the corporation, secured by mortgages on the business property and personal guarantees of the McBrides and mortgages on their residence. On several occasions plaintiff had informed the McBrides or the corporation of checks written by the corporation which created an overdraft in the corporation's account, and on each occasion plaintiff had allowed the corporation to deposit funds to cover the overdraft.

On Saturday, March 28, 1992, Makler informed defendants the corporation had an overdraft of approximately $20,000 on a check written to GMAC. The McBrides and the corporation were ready,

willing, and able to cover the overdraft with a cash receipts deposit of approximately $34,000. Makler informed defendants the check to GMAC would be held until Monday, March 30, 1992, and a deposit to cover the overdraft was not necessary until March 30. This representation was false, as plaintiff returned the check to GMAC for insufficient funds on March 28.

Upon receiving the returned check, GMAC terminated its relationship with defendants. As a result of GMAC's termination of financing, the corporation was forced out of business. With the loss of its income, the corporation was unable to remain current on its payments to plaintiff.

Plaintiff filed a complaint in foreclosure against defendants to collect on the loans, foreclose on the property securing the loans, and enforce the McBrides' personal guarantees. Defendants filed a counterclaim alleging tortious interference with a business relationship, breach of fiduciary duty, breach of implied covenant of good faith and fair dealing, and fraud. The counterclaims were later amended to allege estoppel and wrongful dishonor. Defendants also filed a motion to dismiss. Defendants filed an answer and affirmative defenses alleging wrongful dishonor of the check to GMAC by plaintiff. All the affirmative defenses and counterclaims were based on plaintiff's dishonor of the check to GMAC contrary to its established practice, and contrary to Makler's representation to defendants.

Plaintiff filed a motion to strike defendants' affirmative defenses and a motion to dismiss the counterclaims on the basis that Makler's representation was an oral agreement to extend credit, and claims and defenses based on such an agreement are barred by the Act. Plaintiff also submitted an affidavit from Makler which stated the bank's midnight deadline, beyond which if plaintiff held the check it would become obligated to pay it, with respect to the defendant corporation's check to GMAC was March 28, 1992.

The trial court, in a ruling which included a very helpful summary of the facts and issues involved and the reasoning followed in reaching its decision, held the Act applied to bar defendants' counterclaims and affirmative defenses based on Makler's representation the check to GMAC would be held until March 30, 1992. The court ruled since the bank's midnight deadline was March 28, and holding the check until March 30 would have obligated the bank to pay it, Makler's promise to hold the check was a credit agreement within the coverage of the Act. Since the alleged agreement was not in writing and therefore unenforceable, it could not provide a basis for defendants' counterclaims and affirmative defenses.

Summary judgment eventually was granted to plaintiff on all counts. A notice of appeal to this court was filed by defendants requesting reversal of the trial court's order dismissing defendants' counterclaims and affirmative defenses.

■ The Act defines a "credit agreement" as "an agreement or commitment by a creditor to lend money or extend credit or delay or forbear repayment of money not primarily for personal, family or household purposes, and not in connection with the issuance of credit cards." (815 ILCS 160/1(1) (West 1992).) Defendants assert the transaction at issue is not within the purview of the Act because there was no credit agreement, arguing an agreement to *hold* a check drawn on insufficient funds, as opposed to covering a check, is not a commitment to lend money or extend credit or delay or forbear the repayment of money.

The trial court did not expressly rule on this contention, instead finding the operation of the bank's midnight deadline for returning the check made a promise to hold the check equivalent to a promise to cover the check. A payor bank is liable for an item which it holds beyond its midnight deadline. (810 ILCS 5/4—302(a)(1) (West 1992).) Defendants argue the effect of this rule does not convert the Bank's promise to hold the check into a promise to cover the check so the promise was in effect a credit agreement within the coverage of the Act, since the facts establishing the Bank's midnight deadline with respect to the check were not known to defendants. Defendants allege they had no knowledge holding the check until March 30, 1992, would obligate the Bank to pay the check regardless of whether defendants made a deposit to cover it. Defendants argue since they had no intention of obtaining credit from plaintiff, Makler's promise to hold the check could not have been intended or understood to create a credit agreement.

In determining whether there is an agreement for the extension of credit for purposes of the Act, however, there is little difference between the Bank holding a check until a deposit is made to provide sufficient funds to cover the check, and its covering the check, regardless of the operation of the Bank's midnight deadline rules. In either case the Bank is waiting for funds from the drawer of the check to cover the amount of the check.

Defendants' argument that holding a check does not involve credit depends on the fact that if the check is held the Bank is not advancing its own funds but is withholding payment to the payee until sufficient funds are received from the drawer of the check to cover it. There is no *repayment* to bring the transaction within the Act, merely the initial *payment* of the funds from the drawer, which

the Bank will then relay to the payee of the check. As defendants argue, they were not specifically asking plaintiff to forbear the repayment of money owed to it, but were promised plaintiff would forbear action it was authorized to take in returning the check, pending the payment of funds to cover the check which had been drawn on insufficient funds.

■ Although defendants did not expressly ask plaintiff for credit, Makler's promise defendants could wait until Monday, March 30, to make a deposit to cover the check to GMAC was essentially an offer of credit, which defendants accepted by delaying their deposit, thus forming the agreement which brought the transaction within the coverage of the Act. In the circumstances of this case, defendants did not have to expressly ask plaintiff for an extension. When the check from the defendant corporation to GMAC—which was drawn on insufficient funds in the corporation's account—arrived at the Bank, plaintiff had the right to return the check immediately. (810 ILCS 5/4—402(a) (West 1992).) Makler's representation the Bank would wait until Monday before returning the check for insufficient funds was in effect an offer to extend credit to defendants until then. Defendants' acceptance of this offer effectively formed a credit agreement.

■ Defendants next argue even if Makler's promise the Bank would hold the check until Monday, March 30, 1992, was a credit agreement within the meaning of the Act, the Act does not bar their counterclaims sounding in tort, citing cases allowing a fraud claim even where a contract claim is barred by the statute of frauds. The Act, however, is broadly worded. It bars actions by a debtor "on or in any way related to a credit agreement" unless there is a written agreement. (815 ILCS 160/2 (West 1992).) There is no limitation as to the type of actions by a debtor which are barred by the Act, so long as the action is in any way related to a credit agreement. This is in contrast to the language of section 1 of the Frauds Act, which bars actions *upon* certain agreements which are not in writing. (740 ILCS 80/1 (West 1992).) The language of the Act bars all actions by a debtor based on, or related to, an oral credit agreement. Where the language of a statute is certain and unambiguous, a court need not refer to the legislative history, but must enforce the statute as written. (*Business & Professional People for the Public Interest v. Illinois Commerce Comm'n* (1991), 146 Ill. 2d 175, 207, 585 N.E.2d 1032, 1044.) Therefore, all actions which depend for their existence upon an oral credit agreement are barred by the Act.

We recognize such an interpretation causes a harsh result for bank customers in some circumstances. The Act is very broadly

worded, however, and dictates such a result. Bank customers do make oral agreements with their banks. Most often these agreements are honored by the banks and no problem results. However, if a bank for some reason chooses not to honor the agreement, the customer has no recourse in the law. There is no justifiable reliance on an oral credit agreement as a matter of law in Illinois.

■ The agreement at issue in this case is not typical of the disputes which caused the legislature to enact the statutory bar to actions by debtors on oral promises to lend money. However, as we have noted, the language chosen by the legislature to remedy the problem it perceived was very broad. The factual situation alleged here is not conducive to reduction to a written agreement, since the transaction took place over the telephone, and the promise covered a period of only two days. This type of agreement may be at the extreme of what the legislature intended to cover, but it is within the coverage of the Act.

Defendants assert their counterclaim for tortious interference with a business relationship is not barred because it is not related to the disputed credit agreement. Such an assertion is not supported by the facts. The only action of plaintiff which supports this claim is its failure to honor its promise to hold, rather than return, the defendant corporation's check to GMAC. Without this there would be no claim for tortious interference with defendants' business relationship with GMAC. This counterclaim is also based "on or in any way related to a credit agreement." 815 ILCS 160/2 (West 1992).

■ Defendants argue even if the Act does encompass the fact situation involved here, it does not bar traditional exceptions to a statute of frauds defense. Plaintiff counters the language of the Act is broader than the Frauds Act (740 ILCS 80/0.01 *et seq.* (West 1992)), and thereby also works to bar traditional exceptions to the application of the Frauds Act.

Defendants assert promissory estoppel and partial performance are well-recognized exceptions to the statute of frauds and since neither is expressly excluded by the Act both remain viable. Promissory estoppel is not an exception to the statute of frauds. (*Dickens v. Quincy College Corp.* (1993), 245 Ill. App. 3d 1055, 1062, 615 N.E.2d 381, 386.) Defendants did not plead partial performance, but assert the well-pleaded facts clearly establish it since they continued their business relationship with the Bank in reliance upon its practice concerning occasional overdrafts. Partial performance works to take an oral agreement out of the operation of the statute of frauds in an action at equity. The doctrine does not take an oral agreement outside the statute of frauds in an action at law. (*Cohn v. Checker Motors*

*Corp.* (1992), 233 Ill. App. 3d 839, 845, 599 N.E.2d 1112, 1117.) Here, defendants are seeking monetary damages for plaintiff's failure to honor the agreement for which they are claiming partial performance. Therefore, the doctrine is not available to take the alleged agreement outside the operation of the statute of frauds. (*Dickens*, 245 Ill. App. 3d at 1061-62, 615 N.E.2d at 385.) Since neither of the doctrines advanced by defendants would take the transaction at issue beyond a statute of frauds bar, it is not necessary to decide if the same exceptions would apply to actions otherwise barred by the Act.

■ Defendants argue a series of writings could satisfy the requirements of the Act and Makler's affidavit stating he was not aware of such an agreement does not exclude the possibility a series of writings might exist which would satisfy the requirements of the Act for a written agreement.

Facts supporting the existence of a written contract which satisfies the statute of frauds must be pleaded or reasonably inferable from facts which have been pleaded. (*Dickens*, 245 Ill. App. 3d at 1060, 615 N.E.2d at 384-85.) Defendants here have pleaded a practice and pattern relating to overdrafts and argue it is a fair and reasonable inference there are banking records reflecting such an agreement. Defendants have not pleaded any such documents and there are no facts pleaded which would suggest the existence of any written documents which would satisfy the Act. See *Dickens*, 245 Ill. App. 3d at 1060, 615 N.E.2d at 385.

Defendants' reliance on the Minnesota decision of *Carlson v. Estes* (Minn. Ct. App. 1990), 458 N.W.2d 123, is misplaced. There it was alleged the bank had financed the car sales business through floor plan financing and covering overdrafts on a regular basis. The documents which might have evidenced a written agreement to honor overdrafts were not before the court, but due to the procedural posture of the case, the court took as true the assertion the agreements were written. *Carlson*, 458 N.W.2d at 127-28.

It is not necessary in this case to determine whether a series of writings might satisfy the Act. Defendants have not pleaded sufficient facts to reasonably support an inference there exists a series of writings which might satisfy the requirements of the statute of frauds, regardless of whether such a series of writings would meet the Act's requirement a credit agreement be written.

The judgment of the circuit court is affirmed.

Affirmed.

STEIGMANN and GREEN, JJ., concur.