ARCHITECTURAL METAL SYSTEMS,
INCORPORATED, Plaintiff–
Appellant,

v.

CONSOLIDATED SYSTEMS,
INCORPORATED, Defendant–Appellee.

No. 94–3898.

United States Court of Appeals,
Seventh Circuit.

Argued April 19, 1995.

Decided July 5, 1995.

Jacqueline A. Criswell (argued), James K. Borcia, Tressler, Soderstrom, Maloney & Priess, Chicago, IL, for plaintiff-appellant.

Michael G. Bruton (argued), Paul L. Price, Pretzel & Stouffer, Chicago, IL, for defendant-appellee.

Before POSNER, Chief Judge, FLAUM, Circuit Judge, and SHABAZ, District Judge.*

* Hon. John C. Shabaz of the Western District of Wisconsin.

POSNER, Chief Judge.

The district judge granted summary judgment for the defendant in a suit for breach of contract, and we must decide whether he did so prematurely. It is a diversity suit governed by Illinois law. The facts, construed, in light of the procedural setting, as favorably to the plaintiff as the record permits, and slightly simplified, are as follows:

On January 20, 1992, Mellon Stuart, the general contractor on a project to rehabilitate a train station, solicited bids for a subcontract to provide the metal decking required by the project. AMS, the plaintiff in this suit, was interested in the subcontract. AMS is a middleman, not a fabricator, so it asked for price quotations from fabricators, including CSI, the defendant. CSI's Memphis office submitted a price quotation which stated however that any actual order must be approved by CSI's headquarters in South Carolina. Armed with CSI's price quotation (which CSI sent to Mellon Stuart as well as to AMS), AMS on February 12 submitted a $1.9 million bid to Mellon Stuart. Mellon Stuart accepted AMS's bid two days later, on February 14. Shortly afterward, however, Mellon Stuart altered its specifications (as it had reserved the right to do) with regard to the painting of the metal decking, and invited AMS to submit a revised bid. AMS sent the altered specs to CSI and to another fabricator, Bowman, for revised price quotations. Both Bowman and, on March 24, CSI submitted revised price quotations to AMS. CSI's new price was $769,033, less than half of Bowman's price. AMS submitted a revised bid to Mellon Stuart on April 6 after informing CSI that it would be submitting CSI's price quotation to Mellon Stuart and that it wanted to be sure that the quotation was correct (and it was so assured), and after extracting CSI's agreement to post a performance bond if CSI got the order. CSI's price quotation did not contain the clause in the previous one requiring approval by headquarters.

Mellon Stuart thought AMS's new price too high. Negotiations ensued, and AMS

lowered the price slightly, to $1,884,195. On April 14 Mellon Stuart formally accepted AMS's new bid. AMS informed CSI of this, and there was some further discussion of specifications, leading CSI to submit a new bid to AMS on April 24 but with prices identical to those in the March 24 bid for items included in both bids. The clause requiring approval by headquarters was again omitted. The parties then discussed escalation terms and, according to notes taken by AMS's negotiator, reached agreement on them. On April 28, CSI's salesman in Memphis (Allen), with whom AMS had been dealing, faxed AMS that "we look forward to working with you on the transit project." On the same day, AMS prepared and mailed a purchase order to CSI, but at the same time it told Allen that the order was a mere formality; they had a deal.

CSI, however, responded to AMS's purchase order on May 1 with a revised bid in which it raised its price by 73 percent, claiming that it had made a mistake in calculating the price in its previous bids. AMS rejected the bid, insisting that CSI honor the deal previously struck. When CSI refused, AMS turned to another supplier—to whom it had to pay $260,967 more than the price in CSI's bid of April 24. This suit, to recover that addition, followed. AMS argues both conventional breach of contract and promissory estoppel. The parties agree that the issues are governed by the Uniform Commercial Code as interpreted by the courts of Illinois.

■ Regarding the contract claim as distinct from the claim of promissory estoppel, the district court held that CSI's price quotations were not offers and anyway were not accepted. They were not offers first because they lacked detail and second because they were conditioned on approval by CSI's headquarters. The record does not support either conclusion. The test for an offer is whether it induces a reasonable belief in the recipient that he can, by accepting, bind the sender. *McCarty v. Verson Allsteel Press Co.,* 89 Ill.App.3d 498, 44 Ill.Dec. 570, 411 N.E.2d 936, 943 (1980); *Restatement (Second) of Contracts* § 24 (1981). A lack of essential detail would negate such a belief, since the sender could not reasonably be

expected to empower the recipient to bind him to a contract of unknown terms. "I would like to buy your hamster" is not intended to empower the recipient of that solicitation to reply: "My price is $1 million. We have a contract." Granted, the degree to which the reasonable recipient will think a vague offer intended to empower him to create by acceptance a legally enforceable contract depends on the courts' attitudes toward vague offers. The more willing the courts are to interpolate missing terms, the more difficult it is for the recipient of a vague offer to interpret the intentions behind the offer. In Michigan during the heyday of the *Toussaint* decision (*Toussaint v. Blue Cross & Blue Shield,* 408 Mich. 579, 292 N.W.2d 880, 885 (1980)) from which the Supreme Court of Michigan has recently backed off, *Rowe v. Montgomery Ward & Co.,* 437 Mich. 627, 473 N.W.2d 268, 273–75 (1991), no promise was too vague to support an enforceable contract (at least of employment), so no inference that a vague offer was not really an offer could be drawn from its vagueness. Illinois has never gone that far; contracts in Illinois really can fail for Indefiniteness. See, e.g., *Academy Chicago Publishers v. Cheever,* 144 Ill.2d 24, 161 Ill.Dec. 335, 578 N.E.2d 981 (1991). Since this is so, the recipient of a hopelessly vague offer should know that it was not intended to be an offer that could be made legally enforceable by being accepted.

■ CSI's April 24 price quotation was not hopelessly vague. It specified the items to be sold, the quantity and price of each item, and the delivery terms. These are the essential terms of a contract for the sale of goods. As long as the remaining terms, covering warranty, excuses, remedies, and so forth can be pieced out from trade usage, an unexplored issue in this case, the contract will not fail for indefiniteness, *Wait v. First Midwest Bank/Danville,* 142 Ill.App.3d 703, 96 Ill.Dec. 516, 522, 491 N.E.2d 795, 801 (1986), or—what amounts to the same thing—the "offer" be deemed the mere solicitation of an offer, as in *McCarty v. Verson Allsteel Press Co., supra,* 89 Ill.App.3d 498, 44 Ill.Dec. 570, 411 N.E.2d at 943. The parties had ironed out their differences over escalation terms and the bond, and having

done so thought they had a deal—a contract. That is, they thought they had resolved the only potential deal-busting disagreements. At any rate there was enough evidence of this to preclude summary judgment for the defendant.

■ The Uniform Commercial Code, its draftsmen mindful of the haste and sloppiness, and disregard for lawyerly niceties, that characterize commercial dealing, tolerates a good deal of incompleteness and even contradiction in offer and acceptance. This is clearest in its rejection of the common law's "mirror image" rule. Under the UCC, the fact that the acceptance contains different terms from the offer does not convert the acceptance into an offer or otherwise make it ineffective as an acceptance. UCC § 2–207; *Northrop Corp. v. Litronic Industries*, 29 F.3d 1173 (7th Cir.1994). The parties have a contract despite the discrepancies. The course of dealing here is typical of the commercial practices that under the UCC result in the formation of enforceable contracts.

■ A person can prevent his submission from being treated as an offer by suitable language conditioning the formation of a contract on some further step, UCC § 2–207(2)(a); *La Salle National Bank v. Vega*, 167 Ill.App.3d 154, 117 Ill.Dec. 778, 520 N.E.2d 1129, 1133 (1988); *Northrop Corp. v. Litronic Industries, supra*, 29 F.3d at 1179, such as approval by corporate headquarters. The district judge thought that the inclusion of such a clause in previous price quotations by CLS put AMS on notice that such approval would be required even for price quotations not containing the clause. That is a *non sequitur*. For all AMS knew, the clause had been left out because the Memphis office had obtained the requisite approval from the home office in South Carolina. What is more, in an affidavit submitted by AMS to which the district judge unaccountably failed to refer, a former officer of CLS stated that home-office approval was not in fact required. We suppose it could be argued that even if the clause was not intended seriously, unless AMS knew this it would not think the price quotation an offer and therefore would not intend to accept it and so create a binding contract. Whether this tortuous reasoning has any basis in law is irrelevant, however-

er, because AMS treated the price quotations as offers and because the last two quotations, those of March 24 and April 24, omitted the clause. CSI argues that the omission was inadvertent and known by AMS to be such, but these obviously are issues for trial rather than for summary judgment.

■ Equally premature is the judge's conclusion that if the price quotations were offers, AMS did not accept them because its acceptance, which the judge deemed to be the purchase order of April 28, contained discrepant terms. We have already pointed out that a discrepancy between offer and acceptance does not prevent the formation of a contract. CSI's brief contains an imposing list of discrepancies, which it describes as "radical," but admits that there is not a shred of evidence that they were potential deal-busters. An example of one of these "radical" discrepancies is that CSI's March 24 and April 24 price quotations specify "G–90" steel while the purchase order specifies "G–60" steel. We have no idea what this difference signifies. For all we know it is (to persons knowledgeable in the trade) an obvious typographical error, inverting "9" and thus turning it into "6." The Uniform Commercial Code, moreover, does not make even "radical" differences between offer and acceptance a ground for concluding that there is no contract. If there is an offer and an acceptance, then however discrepant (within reason) their terms are, there is a contract, and the question is merely *what* the terms are. *Northrop Corp. v. Litronic Industries, supra*, 29 F.3d at 1175, 1179. (The possibilities are the terms in the offer, the terms in the acceptance, or "default" terms interpolated by the court.) Nor is it even clear that the purchase order here, with its discrepant terms, *was* the acceptance. The acceptance may have been oral.

■ Which brings us to the question whether the contract, if there was one, was made unenforceable by the statute of frauds. We think not. Between the price quotations and the purchase order (whether or not it was the formal acceptance of CSI's offer), there was enough indication of the terms of the parties' contract to satisfy the UCC's not

very demanding statute of frauds. UCC § 2-201; *Monetti, S.P.A. v. Anchor Hocking Corp.*, 931 F.2d 1178, 1182-83 (7th Cir.1991).

▆▆▆ Since the case must go back to the district court for a trial, we should consider whether AMS's alternative theory of liability, that based on promissory estoppel, is also viable. The theory is simply that AMS, in deciding what price to bid for the contract with Mellon Stuart, reasonably relied, to its detriment, on CSI's expressed willingness to sell metal decking at the low price in the March 24 and April 24 price quotations. We adhere to the view tentatively adopted in *Goldstick v. ICM Realty*, 788 F.2d 456, 464-66 (7th Cir.1986), and since confirmed (as a prediction of Illinois law) by two decisions of the Illinois Appellate Court, *First National Bank v. McBride*, 267 Ill.App.3d 367, 204 Ill.Dec. 676, 642 N.E.2d 138, 142 (1994); *Dickens v. Quincy College Corp.*, 245 Ill. App.3d 1055, 185 Ill.Dec. 822, 615 N.E.2d 381, 386 (1993), that the statute of frauds is applicable to a promise claimed to be enforceable by virtue of the doctrine of promissory estoppel. That is not a problem here; the alleged promise is the price quotations, which are written, not oral.

▆▆▆ The judge, while intimating that the statute of frauds might bar AMS's claim of promissory estoppel, rejected the claim on different grounds. The first was that AMS had not relied on CSI's price quotations, since it had entered into a binding contract with Mellon Stuart on February 14, before it had received final bids from CSI. This ignores the fact that Mellon Stuart reopened the bidding after altering its specifications, which required AMS to submit a new bid. AMS submitted its new bid on April 6, after and in reliance on CSI's price quotations of March 24 (which essentially were repeated on April 24), and became bound on April 14, when Mellon Stuart accepted the new bid. So far as we can determine from the record, AMS was under no contractual obligation to Mellon Stuart to submit a revised bid, let alone at a particular price. Had it known how much CSI would charge, it might have submitted a higher bid, or no bid; either way, it would not have been in breach of the contract previously made with Mellon Stuart on the basis of AMS's February bid. The contract based on that bid, the contract that took effect on February 14 when Mellon Stuart accepted AMS's bid of two days earlier, became defunct when Mellon Stuart altered the specs and invited a new bid.

▆▆▆ Second, the judge thought that AMS's reliance on CSI's price quotations could not be reasonable, given the disparity between CSI's price and Bowman's. The judge ruled that AMS should have known, or at least suspected, that CSI's price had been computed erroneously. At the argument of the appeal, CSI's lawyer rather recklessly argued that whenever one bid is at least 50 percent lower than the next lowest, acceptance of the low bid does not create a binding contract; the buyer is on notice of the existence of a mistake. There is no such rule of law. *Community Consolidated School District No. 169 v. Meneley Construction Co.*, 86 Ill.App.3d 1101, 42 Ill.Dec. 571, 573, 409 N.E.2d 66, 68 (1980); *Chicago City Bank & Trust Co. v. Wilson*, 86 Ill.App.3d 452, 41 Ill.Dec. 466, 407 N.E.2d 964, 968 (1980). It would lead to absurdities. If a person hailed a cab, asked what the price would be to his destination, was told $10, said it was too high, hailed another cab, was quoted by that cabbie a price of $5, and agreed, the second cabbie would be able to demand a higher price, on the ground that the passenger should have known by reason of the discrepancy in prices that the $5 price had been computed erroneously.

▆▆▆ There are circumstances in which a mistake can be inferred from the price in the offer. See, e.g., *Vincent DiVito, Inc. v. Vollmar Clay Products Co.*, 179 Ill.App.3d 325, 128 Ill.Dec. 393, 534 N.E.2d 575, 577 (1989); *S.N. Nielsen Co. v. National Heat & Power Co.*, 32 Ill.App.3d 941, 337 N.E.2d 387, 389-90 (1975); 2 E. Allan Farnsworth, *Farnsworth on Contracts* § 9.4 (1990). Suppose that CSI's bid had been, not $769,033, but $7,690.33. AMS could not cry "Gotcha!" It would know that a mistake had been made. Perhaps it should have drawn that inference here. But that would depend on the circumstances. Bowman's bid could have been mistaken on the high side. There is no evidence

of that but there is evidence that there were special reasons why Bowman's price was much higher than CSI's that had nothing to do with mistake by anyone. The judge's comment on that evidence was, "We are not persuaded that these factors justify reasonable reliance." This is not the language of summary judgment. The weighing of evidence is the task for trial. The function of summary judgment is to determine whether there are contestable issues. Whether a 56 percent discrepancy between two bids to supply metal decking for the rehabilitation of a train station should make a bulb light up in the brain of the person to whom the bids have been submitted remains profoundly uncertain on this record. We note that CSI does not as one of its defenses to the breach of contract claim seek reformation of the contract on the ground of mistake. We express no view on whether that course remains open to it in the further proceedings that must be conducted in the district court.

REVERSED AND REMANDED.