KENNETH O. McALOON *et al.*, Plaintiffs-Appellants, v. NORTHWEST BANCORP, INC., *et al.*, Defendants-Appellees.

Second District   No. 2—94—1232

Opinion filed August 28, 1995.

Paula Tipton Wallin, of Glen Ellyn, for appellants.

David G. Lynch, of Rudnick & Wolfe, of Chicago, for appellees.

JUSTICE DOYLE delivered the opinion of the court:

Plaintiffs, Kenneth McAloon and Harrow Gate Builders, Inc., brought an action for breach of contract and fraud in the circuit court of McHenry County against defendants, Northwest Bancorp, Inc., Charter Bank and Trust (Charter), its officers and directors, and George Moser, John Hayes, Jr., and Christine Moser Altenberger, individually and as officers and directors. Plaintiffs sought to recover damages occasioned by defendants' alleged oral misrepresentation committing Charter, twice, to loan money to plaintiffs and then failing to adhere to both commitments. Both plaintiffs' original and first amended complaints were dismissed without prejudice. Plaintiffs filed a second amended complaint. Defendants then moved to dismiss that complaint, raising the Credit Agreements Act (Act) (815 ILCS 160/1 et seq. (West 1992)) as a defense to plaintiffs' claims. Defendants asserted that because the alleged loan commitments were not in writing and were not signed by both parties, as required by the Act, the claims were barred. Based on the Act, the trial court granted defendants' motion to dismiss. Plaintiffs filed a timely appeal.

On appeal plaintiffs contend that: (1) the trial court erred in dismissing their second amended complaint based on the court's application of the Act to plaintiffs' claims; (2) the trial court erred in finding that plaintiffs' equitable estoppel claim did not defeat application of the Act; and (3) the trial court erred in dismissing the fraud action against the individual defendants.

In their second amended complaint, plaintiffs alleged that prior to August 1992 defendants had granted plaintiffs' oral loan commitments, honoring such commitments as if written up in full, and that plaintiffs had relied on this operating procedure as the "necessary, true and correct method" of obtaining loans from defendants. According to plaintiffs, defendants rarely granted written loan commitments, and defendants' officers and directors were instructed not to place loan commitments in writing so that defendants could avoid lender liability suits.

Before August 1992, defendants loaned plaintiffs money for phase I of a multiphase construction project. To obtain funding for the land acquisition and development of phase II, plaintiffs went to Midwest Bank in Melrose Park, which verbally committed to provide funding if plaintiffs obtained a permanent loan commitment from another lender. Seeking a backup letter of credit, plaintiff McAloon spoke with defendant Charter on or about September 5, 1992. McAloon also sought funds for cost overruns of phase I and refinancing of the third mortgage on his personal residence in which Charter had placed a security interest as collateral for the multiphase construction project.

Plaintiffs alleged that Charter's senior loan officer prepared a written proposal of McAloon's loan request and presented it to the bank's loan committee. Plaintiffs further alleged that Charter agreed to provide the funds to finance the cost overruns, the acquisition and development of phase II, and the refinancing of McAloon's third mortgage. Plaintiffs asserted that approval of the loan proposal was signified by the fact that the committee members present at the time of the approval placed their initials on the written proposal.

According to plaintiffs' complaint, one of plaintiffs' subcontractors, who was to be paid from the loan proceeds under Charter's loan commitment, contacted Charter to verify approval of the loan before beginning work on phase II of the project. Plaintiffs alleged that Charter assured the subcontractor of its loan commitment.

Plaintiffs further claimed that on or about September 15, 1992, the loan committee reevaluated plaintiffs' loan structure and then decided not to honor the loan. Plaintiffs alleged that up to this time Charter rarely withdrew a prior loan commitment, choosing instead to work on restructuring the loan mechanics. According to plaintiffs,

one committee member, allegedly, suggested that the bank falsify the reason for disallowing the loan approval. Plaintiffs asserted Charter then informed them that it had received a bank examiner notice that the bank had become too heavily concentrated in real estate loans and, therefore, was unable to honor its loan commitment to plaintiffs.

Plaintiffs alleged that in reliance on Charter's loan commitment subcontractors had initiated work on the construction project and McAloon had spent personal monies for some of the development costs, which the bank had promised to fund. Additionally, withdrawal of the loan commitment stopped the cash flow that allowed plaintiffs to function effectively as a contractor and developer.

According to the complaint, plaintiffs contacted Valley Bank of Du Page County and received a verbal commitment for a permanent loan commitment letter, which would take 8 to 12 weeks to process. Early in October 1992, Charter offered to restructure its original loan commitment to meet with the bank examiner's approval. Plaintiffs alleged that as a result of this offer they relinquished the opportunity to seek loan funding from Valley Bank of Du Page County and instead accepted Charter's offer to restructure the loan.

Between November and December 1992, Charter wrote a letter to the seller of the land to be used for phase II, indicating that plaintiffs' loan had been approved and that funds would be released after the sale of two units of phase I. Plaintiffs asserted that this statement within Charter's letter constituted the first indication of a condition precedent to the release of the funds. Plaintiffs alleged that they were unable to meet this condition precedent since the loan was needed to finalize the interiors and landscaping of the units in phase I as well as for the land acquisition for phase II. Plaintiffs had two buyers for units, but one was unwilling to close on an incomplete unit. The other agreed to close if plaintiffs could find a lender to finance the unit. This buyer applied to Charter and, allegedly, was informed several months later that Charter would not lend the buyer money, as to do so would benefit plaintiffs, which the bank was not willing to do.

Plaintiffs asserted that Charter had breached the second oral agreement to lend funds to plaintiffs despite plaintiffs' efforts to accommodate the bank and that, as a result, plaintiffs had experienced financial difficulties. Plaintiffs also asserted that by the time Charter and plaintiffs had entered into a "work-out agreement" to complete construction of phase I of the project and to protect Charter's interests in that phase, it was too late to assist plaintiffs financially.

In addition to alleging breach of contract against defendants, plaintiffs also alleged common-law fraud and misrepresentation.

Plaintiffs asserted that defendants had a duty to exercise reasonable care in making true representations regarding Charter's loan abilities, loan approvals, commitment procedures and expectations, and ability to work with plaintiffs' financial needs. Instead, defendants failed to disclose Charter's discomfort in lending money to plaintiffs for the continued development of the construction project, the bank's concerns regarding plaintiffs' credit worthiness, the legal requirement that written commitments be signed by both parties, and the requirement that plaintiff sell two units of phase I before the bank would release loan proceeds. Plaintiffs alleged that, as a result of the misrepresentations of Charter and the individual defendants, plaintiffs had to use personal and business funds between September 1992, the time of the first loan approval, and May 1993, the final work-out agreement, to cover overhead and expenses of its projects. According to plaintiffs, defendants' fraudulent acts and misrepresentations were the proximate cause of plaintiffs' actual losses, including loss of a building; loss of plaintiffs' business goodwill with other contractors, developers, and creditors; and loss of plaintiffs' abilities to convert real estate projects to cash equivalents for debt resolution.

Following a hearing on defendants' motion to dismiss plaintiffs' second amended complaint, the trial court granted the motion, finding that plaintiffs' claims were barred by the Credit Agreements Act (815 ILCS 160/1 *et seq.* (West 1992)). This appeal ensued.

Plaintiffs first contend that the trial court erred in dismissing their second amended complaint based upon the applicability and effect of the Act upon defendants' alleged loan commitments to plaintiffs.

■ The Act provides that "[a] debtor may not maintain an action on or in any way related to a credit agreement unless the credit agreement is in writing *** and is signed by the creditor and the debtor." (815 ILCS 160/2 (West 1992).) "Credit agreement" is defined, in relevant part, as "an agreement or commitment by a creditor to lend money or extend credit or delay or forbear repayment of money." 815 ILCS 160/1(1) (West 1992).

■ Little relevant case law interpreting the Act exists, but the plain language of the Act is very clear and very broad. The language bars all actions by a debtor based on or related to an oral credit agreement. (*First National Bank v. McBride Chevrolet* (1994), 267 Ill. App. 3d 367, 372.) As stated in their complaint and acknowledged in their brief, plaintiffs' action for breach of contract and fraud was founded upon alleged oral misrepresentations by defendants. Plaintiffs alleged that on two separate occasions Charter had orally agreed to lend monies and then had failed to disburse the funds. As

plaintiffs' action depended upon oral credit agreements, it was barred by the Act.

We note that plaintiffs alleged in their second amended complaint that a written proposal of plaintiffs' loan request was presented to Charter's loan committee early in September 1992 and that the initials of each director present at the approval meeting appear on the proposal. The implication, here, is that a director's initials are equivalent to his signature and that, therefore, the proposal constitutes a credit agreement. Absent from plaintiffs' complaint, however, is any allegation that the proposal had also been signed by plaintiffs. The Act clearly sets forth that a credit agreement not only must be in writing but also must be signed by both the creditor and debtor. (815 ILCS 160/2 (West 1992).) As a result, the alleged written proposal, even if it had been signed by the directors, did not satisfy the requirements of the Act and, therefore, could not be deemed a "credit agreement."

Because the Act requires the signatures of both creditor and debtor on a credit agreement, it is evident that the statute was designed to impose a strong form of the Frauds Act. (*Resolution Trust Corp. v. Thompson* (7th Cir. 1993), 989 F.2d 942, 944.) Nonetheless, plaintiffs maintain that even if the Act applies to the fact situation involved here, it does not bar traditional exceptions to a Frauds Act defense, and, therefore, the trial court erred in finding that their claim of equitable estoppel did not defeat application of the Act. Defendants respond that the language of the Act is broader than the language of the Frauds Act (740 ILCS 80/0.01 *et seq.* (West 1992)) and is, consequently, intended to bar the traditional defenses to the Frauds Act. These identical arguments arose in *First National Bank* (267 Ill. App. 3d at 373). There, however, the court found it unnecessary to determine if traditional exceptions to the Frauds Act would apply to actions otherwise barred by the Act because neither of the doctrines advanced by defendants in that case took the transaction at issue beyond a Frauds Act bar. (267 Ill. App. 3d at 373-74.) Consequently, the issue of whether the Act bars traditional exceptions to a Frauds Act defense, such as plaintiffs' equitable estoppel claim here, has not yet been directly decided.

It is well established that equitable estoppel constitutes an exception to the Frauds Act. (*Dickens v. Quincy College Corp.* (1993), 245 Ill. App. 3d 1055, 1062.) Nonetheless, we conclude that equitable estoppel as well as the other traditional exceptions to a statute of frauds' defense should be inapplicable to the Act. We find informative an article, written after the Act was enacted, which examined the scope of the Act from a defense point of view. (Kouri & Karnopp,

*An Act in Relation to Credit Agreements: A Statutory Defense to Lender Liability*, 78 Ill. B.J. 348 (1990) (*Kouri*).) The authors opine that in enacting an entirely separate statute pertaining to credit agreements rather than amending the existing Frauds Act to include credit agreements, the legislature expressed its intent that the Act should extend beyond the Frauds Act and that, therefore, the traditional defenses to the Frauds Act should be inapplicable to the Act. This conclusion is based on the facts that the Act "mirrors its Minnesota counterpart almost entirely" (Minn. Stat. § 513.33 (1986)) and that the Minnesota Court of Appeals has held that such traditional defenses are inapplicable to the Minnesota statute (*Becker v. First American State Bank* (Minn. Ct. App. 1988), 420 N.W.2d 239). (*Kouri*, 78 Ill. B.J. at 350-51.) We agree that the legislature intended for the Act to extend beyond the existing Frauds Act and the traditional defenses to that statute.

We also agree that by enacting an entirely separate statute instead of simply amending the existing Frauds Act our legislature, like the Minnesota legislature, rejected limiting the Act to breach of oral contract actions. Section 3 of the Act appears to bar suits based on certain oral representations which would not typically be considered a breach of contract. That section provides:

> "Actions not considered agreements. The following actions do not give rise to a claim, counter-claim [*sic*], or defense by a debtor that a new credit agreement is created, unless the agreement satisfies the requirements of Section 2:
> (1) the rendering of financial advice by a creditor to a debtor;
> (2) the consultation by a creditor with a debtor; or
> (3) the agreement by a creditor to modify or amend an existing credit agreement or to otherwise take certain actions, such as entering into a new credit agreement, forbearing from exercising remedies in connection with an existing credit agreement, or re-scheduling or extending installments due under an existing credit agreement." (815 ILCS 160/3 (West 1992).)

As stated, the section bars tortious causes of action such as the fraud and misrepresentation count plaintiffs alleged in their second amended complaint. Thus, the fact that an action is grounded in something other than contract law does not change the applicability of the Act. (*Whirlpool Financial Corp. v. Sevaux* (N.D. Ill. 1994), 874 F. Supp. 181, 187.) As long as the action is "in any way related" to a credit agreement, it is barred by the Act. (*First National Bank*, 267 Ill. App. 3d at 372.) Because plaintiffs' fraud and misrepresentation claims are related to a credit agreement, those claims are defeated by the Act.

Given the broad language of the Act and our conclusion that the Act is intended to extend beyond the Frauds Act, we conclude the Act bars traditional exceptions to the application of the Frauds Act such as equitable estoppel. Accordingly, the trial court did not err in finding that the Act prevailed over plaintiffs' claim of equitable estoppel.

■ Plaintiffs also contend that the trial court erred in dismissing the fraud action against the individual defendants. While it is established that corporate officers, although generally not liable for the corporation's obligations, are personally liable for the corporation's torts, such as fraud (*Mannion v. Stallings & Co.* (1990), 204 Ill. App. 3d 179, 191; *National Acceptance Co. v. Pintura Corp.* (1981), 94 Ill. App. 3d 703, 706), the complaint in the present case failed to allege sufficient facts to support a fraud action against any of the named individual defendants other than George Moser. Nevertheless, any claim of fraud against Moser was barred under section 3 of the Act. (815 ILCS 160/3 (West 1992).) Therefore, the trial court correctly dismissed the fraud action against the individual defendants.

As stated by the court in *First National Bank*, enforcing the Act as written causes harsh results for bank customers in some circumstances, but the Act is very broadly worded and dictates such a result. (*First National Bank*, 267 Ill. App. 3d at 372-73.) All actions which depend upon an oral credit agreement for their existence are barred by the Act. *First National Bank*, 267 Ill. App. 3d at 372.

Accordingly, we conclude that the trial court did not err in granting defendants' motion to dismiss the plaintiffs' second amended complaint, and, therefore, we affirm the judgment of the circuit court of McHenry County.

Affirmed.

INGLIS and HUTCHINSON, JJ., concur.