In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1208

HELP AT HOME, INCORPORATED,

Plaintiff-Appellant,

v.

MEDICAL CAPITAL, L.L.C., d/b/a MEDCAP,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 3799--James F. Holderman, Judge.

ARGUED JANUARY 12, 2001--DECIDED AUGUST 7, 2001

Before RIPPLE, ROVNER and EVANS, Circuit
Judges.

RIPPLE, Circuit Judge.  Help At Home,
Inc. ("HAH") filed this diversity action
against Medical Capital, L.L.C.
("MedCap") for breach of contract,
promissory estoppel, and breach of the
implied duty of good faith and fair
dealing. MedCap moved to dismiss HAH's
claims as barred by the Illinois Credit
Agreements Act, 815 ILCS 160/1 et seq.
("ICAA"). The district court granted
MedCap's motion, and HAH now appeals. For
the reasons set forth in the following
opinion, we affirm the judgment of the
district court.

I

BACKGROUND

A.  Facts

  HAH is a non-medical home care provider.
It had borrowed money from Harris Bank
and had defaulted on its payments. Harris
Bank agreed to forbear temporarily from
collecting on the loans, but that
agreement was set to expire on June 8,
1999. Harris Bank indicated to HAH that,
upon expiration of the agreement, it
would use the funds in HAH's accounts at
the bank to offset the amount of the
loans. To prevent this setoff, HAH

entered into an agreement with MedCap under which MedCap allegedly promised "to extend credit sufficient to takeout the Harris Bank loan." R.14 at 2 (internal quotation marks omitted).

HAH and MedCap exchanged several documents related to their financing agreement. A Sale and Servicing Agreement ("SSA") memorialized the terms of the arrangement. The SSA was signed only by HAH's chief operating officer; no representative of MedCap signed the SSA. MedCap also sent Uniform Commercial Code ("UCC") financing statements for various states to HAH and asked HAH to sign and return them. These UCC forms gave MedCap a security interest in HAH's accounts receivable, inventory, and other items, and they explicitly referenced the SSA in the following terms:

This financing statement covers all Receivables now or hereafter created or acquired by the Debtor/Provider [HAH] and sold, transferred or assigned to the Secured Party, MEDCAP Credit Co., LLC. [sic], under the Sale and Servicing Agreement dated as of May 21, 1999, including the Schedules, Exhibits and Addendums thereto, all as now or hereafter amended . . . .

R.17, Ex.C at 2. Some of the UCC forms were signed by both HAH and MedCap; others were signed only by HAH. Lastly, MedCap sent HAH a commitment letter stating that it would "provide financing to [HAH] upon completion of the closing process" and that the funding "would provide proceeds sufficient to takeout the Harris Bank loan." Id. at Ex.A. The chief executive officer of MedCap signed the commitment letter, but the letter did not require a signature from HAH.

On June 8, 1999, MedCap informed HAH that it would be unable to provide the funding HAH needed to repay the Harris Bank loan. As a result, HAH had to secure alternate financing at higher interest rates and under less desirable terms than its agreement with MedCap provided. It then filed suit against MedCap.

B.  Proceedings in the District Court

HAH brought three causes of action against MedCap: breach of contract, promissory estoppel, and breach of the

implied duty of good faith and fair dealing. MedCap moved to dismiss HAH's claims; it argued that its agreement with HAH was one for credit that was unenforceable because there was no writing that expressed the terms of the agreement and that was signed by both parties, as required by the ICAA. HAH responded that the ICAA did not apply to its agreement with MedCap because the agreement was for the sale of HAH's accounts receivable and was not a credit agreement. HAH argued alternatively that the ICAA was satisfied because each of the parties had signed various documents, and, when considered together, the documents clearly evidenced the terms of the parties' agreement.

The district court granted MedCap's motion to dismiss. It first held that HAH had admitted judicially that its agreement with MedCap was a loan by referring to it as such in its complaint. Consequently, the agreement was covered by the ICAA. Noting that this court has described the ICAA as imposing a "strong form of the Statute of Frauds," R.18 at 5 (citing Resolution Trust Corp. v. Thompson, 989 F.2d 942, 944 (7th Cir. 1993)), the court took the view that the ICAA requires that both parties to the loan agreement sign the same document. Notably, the court went on to hold that, even if the parties could comply with the statute by relying on several writings, the writings at issue in this case did not even satisfy the common law requirements of Illinois' general statute of frauds. In that regard, the court pointed out that the loan commitment letter signed by MedCap did not refer to any other unsigned writing; none of the other writings relied upon by HAH referred to or were attached to the letter of commitment. Therefore, there was nothing in HAH's pleadings or argument to demonstrate that the writings constituted a single contract. The district court therefore held that the ICAA barred each of HAH's claims against MedCap.

HAH filed a motion to reconsider. It based its argument on Bank One, Springfield v. Roscetti, 723 N.E.2d 755 (Ill. App. Ct. 1999), appeal denied, 731 N.E.2d 762 (Ill. 2000), which, in its view, established that the ICAA did not require a single writing signed by both

parties. HAH also invited the court's attention to the UCC financing statements, some of which were signed by both parties. The court, however, refused to vacate its earlier dismissal. It stated that it had considered "every document" the parties had submitted and had concluded that the true nature of the transaction was a credit arrangement subject to the ICAA. R.22. It further noted that "those documents, including the [UCC] financing statements, together do not satisfy the requirements of the [ICAA]." Id. Following the district court's denial of its motion to reconsider, HAH filed this appeal.

## II

## DISCUSSION

### A.  Standard of Review

We review the district court's grant of a motion to dismiss de novo. See Home Valu, Inc. v. Pep Boys, 213 F.3d 960, 963 (7th Cir. 2000). We accept all of the well-pleaded factual allegations in the plaintiff's complaint as true and draw all reasonable inferences in favor of the plaintiff. See id. We shall affirm the district court's dismissal of the complaint only if it appears beyond doubt that the plaintiff cannot prove any set of facts that would entitle it to relief. See Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Home Valu, 213 F.3d at 963.

The letter of commitment signed by MedCap, but not by HAH, was referred to in the complaint, and the district court properly considered it as part of the pleadings. See Wright v. Associated Ins. Cos., 29 F.3d 1244, 1248 (7th Cir. 1994). In replying to MedCap's motion to dismiss, HAH supplemented its pleadings with copies of other writings between the parties and the affidavit of Joel Davis, HAH's chief operating officer. The district court also properly considered this material in its ruling on the motion. "A plaintiff need not put all of the essential facts in the complaint;" he may add them by affidavit or brief in order to defeat a motion to dismiss if the facts are consistent with the allegations of the complaint. Hrubec v. Nat'l R.R. Passenger Corp., 981 F.2d 962, 963-64 (7th Cir. 1992).

Because jurisdiction is based on diversity of citizenship, the substantive rights of the parties are governed by state law. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); Lexington Ins. Co. v. Rugg & Knopp, Inc., 165 F.3d 1087, 1090 (7th Cir. 1999). In this case, the parties agree that Illinois law is controlling./1 It is our duty to apply the law that we believe the Supreme Court of Illinois would apply if the case were before that tribunal rather than before this court. See Brunswick Leasing Corp. v. Wis. Cent. Ltd., 136 F.3d 521, 527 (7th Cir. 1998). When the "state supreme court has not ruled on an issue, decisions of the state appellate courts control, unless there are persuasive indications that the state supreme court would decide the issue differently." Lexington, 165 F.3d at 1090.

B.  The ICAA

   1.  Nature of the Parties' Agreement

   We first must resolve whether the transaction between HAH and MedCap is a credit agreement covered by the ICAA. As we have noted earlier, the district court took the view that HAH ought to be bound by its characterization of the agreement as a loan in its complaint. We believe that the district court was on solid ground in reaching that determination. An examination of the amended complaint reveals that, throughout the document, HAH referred to the agreement as a loan. It is a "well-settled rule that a party is bound by what it states in its pleadings." Soo Line R.R. Co. v. St. Louis Southwestern Ry. Co., 125 F.3d 481, 483 (7th Cir. 1997). "Judicial admissions are formal concessions in the pleadings, or stipulations by the party or its counsel, that are binding upon the party making them." Keller v. United States, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995). We have acknowledged that there may be instances in which statements made in superseded pleadings that had been filed early in the litigation should not be characterized properly as admissions. See Moriarty v. Larry G. Lewis Funeral Dirs. Ltd., 150 F.3d 773, 777-78 (7th Cir. 1998). We have no such situation here. Although the original complaint did refer to the transaction as a loan, the same term is repeated in the amended complaint. Indeed, its usage is increased

in that second document. Moreover, it is clear that HAH was aware of the existence of the underlying documents at least by the time that it filed its response to the motion to dismiss because it attached those documents to the response. Therefore, we are not confronted with the preliminary best efforts of a party to provide an initial characterization of the case, but with the deliberate repetition of that characterization in the operative complaint and the maintenance of that characterization up to the time that the motion was submitted to the district court for decision./2

Even if we did not rely on HAH's admission in its amended complaint, we still would conclude that the transaction was a loan. The ICAA defines a credit agreement as "an agreement or commitment by a creditor to lend money or extend credit or delay or forbear repayment of money not primarily for personal, family or household purposes, and not in connection with the issuance of credit cards." 815 ILCS 160/1(1) ("Section 1"). If any portion of the parties' agreement takes the form of a loan or an extension of credit, the ICAA applies. See Whirlpool Fin. Corp. v. Sevaux, 96 F.3d 216, 223 (7th Cir. 1996).

After reviewing the SSA, we conclude that the district court correctly determined that the parties' transaction was a loan covered by the ICAA. Under the SSA, MedCap established a "Facility Limit" for HAH of $5 million, which could be increased at MedCap's discretion and upon HAH's request. R.17, Ex.D at M000050. Within this $5 million limit, HAH could request that MedCap purchase certain of its accounts receivable ("receivables"); whether or not to purchase the receivables was within MedCap's discretion. If MedCap chose to purchase the receivables, the parties would treat that purchase as a sale that vested all rights in the receivables in MedCap. In exchange for this arrangement, HAH would pay MedCap a monthly discount fee, plus a maintenance fee and an "Annual Facility Fee." Id.

The net effect of this agreement was that, as set forth in the commitment letter, MedCap provided accounts-receivable financing to HAH. Specifically, MedCap established a credit

limit for HAH. Within that credit limit, HAH could ask MedCap to loan it funds. HAH's method of repayment was its receivables rather than cash. The monthly fee that HAH was to pay to MedCap for these services was set at an amount "equal to 30/360 of the annualized base rate of Prime + 2.5%, multiplied by the average outstanding Purchase Base for the preceding month." Id. (emphasis in original). The terms of the SSA referring to "sales" of HAH's receivables are best viewed as a device to ensure that MedCap had the legal ability to recoup the funds it lent HAH through the receivables. Because we have concluded that the agreement embodied in the SSA is essentially a loan, the ICAA is implicated, and its terms must be satisfied.

2.  The ICAA's Signature Requirement

The ICAA provides that

[a] debtor may not maintain an action on or in any way related to a credit agreement unless the credit agreement is in writing, expresses an agreement or commitment to lend money or extend credit or delay or forbear repayment of money, sets forth the relevant terms and conditions, and is signed by the creditor and the debtor.

815 ILCS 160/2 ("Section 2"). The ICAA's writing requirement is a strong form of the statute of frauds. See Resolution Trust Corp. v. Thompson, 989 F.2d 942, 944 (7th Cir. 1993); McAloon v. Northwest Bancorp, Inc., 654 N.E.2d 1091, 1094 (Ill. App. Ct. 1995). In particular, it requires the signatures of both parties; the signature of only one party renders the agreement unenforceable. See Resolution Trust, 989 F.2d at 944; McAloon, 654 N.E.2d at 1094. Additionally, the ICAA bars all actions that are in any way related to the alleged credit agreement, whether those actions sound in contract or in tort. See Nordstrom v. Wauconda Nat'l Bank, 668 N.E.2d 586, 588 (Ill. App. Ct. 1996); McAloon, 654 N.E.2d at 1095; First Nat'l Bank in Staunton v. McBride Chevrolet, Inc., 642 N.E.2d 138, 142 (Ill. App. Ct. 1994). It also bars traditional exceptions to the statute of frauds, such as fraud, part performance, and equitable

estoppel. See Whirlpool, 96 F.3d at 226; McAloon, 654 N.E.2d at 1094. Illinois courts have emphasized repeatedly that the ICAA is a broad statute that will be applied the way it was written, even though the results of that application may at times seem harsh. See Mach. Transps. of Ill. v. Morton Cmty. Bank, 687 N.E.2d 533, 535-36 (Ill. App. Ct. 1997); McAloon, 654 N.E.2d at 1095-96; First Nat'l, 642 N.E.2d at 142.

It is clear that the SSA satisfies three of the ICAA's four requirements: It commits the parties' agreement to writing, expresses MedCap's intention to extend credit to HAH, and sets forth the terms and conditions that will govern the arrangement. It does not, however, contain the signatures of both parties. Indeed, several UCC financing statements are the only documents among the many that the parties exchanged that contain the signatures of both parties. The only other document MedCap signed was the commitment letter it sent to HAH. We must decide whether these documents, when considered together with the SSA, aresufficient to satisfy the ICAA.

Neither party questions that, under Illinois' general statute of frauds, the writing evidencing the agreement need not be on a single piece of paper, so long as the signed writing refers expressly to the unsigned writings, or the documents are so connected, either physically or otherwise, that it is evident that they refer to the same contract. See Prodromos v. Howard Sav. Bank, 692 N.E.2d 707, 710 (Ill. App. Ct. 1998); see also Bower v. Jones, 978 F.2d 1004, 1008 (7th Cir. 1992). MedCap, however, argues that, because the ICAA is broader than the general statute of frauds, individual signatures on multiple documents are insufficient. In turn, HAH renews the argument it made to the district court in its motion to reconsider. It contends that, under Bank One, Springfield v. Roscetti, 723 N.E.2d 755 (Ill. App. Ct. 1999), appeal denied, 731 N.E.2d 762 (Ill. 2000), the credit agreement need not be embodied in one document and that the parties' signatures on the UCC forms are sufficient because those forms expressly refer to the SSA.

We are unpersuaded by HAH's argument that Bank One resolves the issue before

us in this case. The issue the Appellate Court of Illinois addressed in Bank One was whether a guaranty agreement, executed at the same time as the guaranteed loan but memorialized in a separate document, was a credit agreement subject to the requirements of the ICAA. See Bank One, 723 N.E.2d at 762-63. Anemployee at Bank One encouraged Roscetti to serve as a guarantor by telling Roscetti that he would watch the borrower "like a hawk." Id. at 758 (internal quotation marks omitted). When Bank One filed suit against Roscetti to enforce the guaranty agreement, Roscetti filed a counterclaim alleging that Bank One had breached its contract to watch the borrower like a hawk. Bank One argued that the ICAA barred Roscetti's enforcement of the oral agreement, and Roscetti responded that a guaranty agreement was not a credit agreement within the meaning of the ICAA. See id. at 758-59.

The court determined that the guaranty agreement was a credit agreement covered by the statute. See id. at 762-63. Although a guaranty relationship ordinarily may not be a credit arrangement, the court determined that this guaranty agreement could not be viewed in isolation from the un-derlying loan entered into with the borrower. Bank One only agreed to extend the loan to the borrower if the borrower could secure a guarantor. As a result, the guaranty agreement was an integral part of the loan, and the written guaranty agreement, along with several other documents, constituted the entire credit agreement. See id. In reaching its decision, the court stated:

A credit agreement often consists of several documents that, together, create the terms of the extension of credit. The documents are, in many instances, conditioned upon each other, and a default under one is usually a default under all. Significantly, the [ICAA] does not limit the definition of "credit agreement" to being a single document.

Id. Because the guaranty agreement was part of the original credit agreement, the court concluded that Bank One's promise to watch the borrower like a hawk was an oral modification of the original agreement that, under the ICAA, was not

enforceable because it was not in writing. See id. at 763.

Bank One addresses the question of whether a credit agreement, as defined in Section 1 of the ICAA, can be comprised of multiple documents, and it resolves that question in the affirmative. However, Bank One gives us no indication of which parties had signed which documents and does not even mention the signature requirement of Section 2 of the ICAA. Although HAH suggests that, under Bank One, the ICAA is satisfied when each party signs one of the documents comprising the credit agreement, it would be just as consistent with Bank One to assert that both parties must sign all of the documents. Indeed, the latter assertion may be more consistent with the express terms of the ICAA. In short, Bank One sheds little, if any, light on the question of whether multiple documents may be aggregated to satisfy the signature requirement of Section 2 of the ICAA, which is the question we must answer in this case.

Only one case addresses squarely the ICAA's signature requirement, and that case does not resolve the precise question we face here. See McAloon, 654 N.E.2d at 1094 (holding that the plaintiffs could not maintain a breach of contract claim based on a written loan proposal initialed by the defendants in the absence of an allegation that the plaintiffs also had signed the proposal). We decline to resolve this heretofore unanswered question of state law because, even if we assume that HAH may rely on multiple documents to satisfy the ICAA's signature requirement, we still would have to conclude that the documents the parties signed in this case were insufficient. The only documents signed by MedCap are its commitment letter and some of the UCC financing statements. As the district court noted, the commitment letter does not support HAH's argument because it does not reference any other document that allegedly comprises the contract nor does it discuss the terms of the parties' agreement. Without some connection to the rest of the documents, we cannot read the commitment letter as demonstrating an intent to contract. See Sims v. Broughton, 589 N.E.2d 1056, 1060 (Ill. App. Ct. 1992) (considering whether a document was "prepared with the view

that it should be evidence of a binding contract").

The UCC financing statements also are too attenuated from the underlying agreement, as expressed in the SSA, to evidence the parties' intent to contract. The UCC forms themselves are designed to secure a property interest created by the underlying agreement; if the underlying agreement is invalid, so is the security interest created by the UCC forms. We do not believe that the policies that the state courts have said animate the ICAA would be served adequately if we were to infer from the UCC forms, which depend on the SSA for their validity, that the SSA itself is valid. Permitting such documents to establish the validity of the underlying credit arrangement would hardly be implementing "a strong form of the Frauds Act." McAloon, 654 N.E.2d at 1094.

The documents in this case that either bear the signatures of both parties or are signed by MedCap simply do not encompass the entire loan agreement. Thus, the terms of the ICAA are not met, even if HAH may rely on all of the documents in the record to satisfy Section 2 of the ICAA. All of HAH's claims against MedCap must fail. SeeNordstrom, 668 N.E.2d at 588-89 (dismissing claims of breach of contract and promissory estoppel for failure to comply with the ICAA); First Nat'l, 642 N.E.2d at 142 (dismissing counterclaim of breach of implied duty of good faith and fair dealing for failure to comply with the ICAA).

Conclusion

The district court was correct in dismissing HAH's complaint for failure to satisfy the terms of the ICAA. Therefore, its judgment is affirmed.
AFFIRMED

FOOTNOTES

/1 See Northbrook Excess & Surplus Ins. Co. v. Procter & Gamble Co., 924 F.2d 633, 637 (7th Cir. 1991) (applying Ohio law in a diversity case when the parties agreed that Ohio's law should govern); see also Echo, Inc. v. Whitson Co., 52 F.3d 702, 707 (7th Cir. 1995) (stating that, when neither party suggests that the law of a state other than the forum state ought to apply, the

forum state's law applies by default); Kritikos v. Palmer Johnson, Inc., 821 F.2d 418, 421 (7th Cir. 1987) (holding that the parties' failure to raise a choice-of-law issue on appeal resulted in a waiver of the issue).

/2 HAH responds by asking us to take judicial notice of a complaint MedCap filed in the Superior Court of California in which MedCap presumably described the agreement as a purchase of accounts receivable, and HAH asks that we bind MedCap to this statement. As an initial matter, we point out that a judicial admission is binding only in the litigation in which it is made. See Higgins v. Mississippi, 217 F.3d 951, 954 (7th Cir. 2000). In other litigation, it is merely an evidentiary admission. See id. at 955. More fundamentally, HAH first raised this argument in its reply brief on appeal, and MedCap has moved to strike the portion of HAH's brief relating to the argument. We agree that HAH, by not making this argument in its opening brief, has waived the issue. See United States v. Spaeni, 60 F.3d 313, 317 (7th Cir. 1995). We therefore grant the motion to strike this argument from HAH's reply brief.