# Illinois Official Reports

## Appellate Court

---

*Avanti Medical Group, LLC v. BMO Harris Bank, N.A.*,
**2014 IL App (2d) 140401**

---

| | |
|---|---|
| Appellate Court Caption | AVANTI MEDICAL GROUP, LLC, and KENNETH BARRICK, Plaintiffs-Appellants, v. BMO HARRIS BANK, N.A., Defendant-Appellee. |
| District & No. | Second District<br>Docket No. 2-14-0401 |
| Filed | December 22, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Plaintiffs' action against defendant bank for breach of a credit agreement was properly dismissed by the trial court on the ground that plaintiffs failed to allege that the agreement satisfied the signature requirement of the Credit Agreements Act, since the only document setting forth any of the loan terms was entitled the "Amended Terms," that document was only signed by the creditor, and the documents with the signatures of both the creditor and the debtor were some of the "Terms Documents," but those documents were generic, preprinted forms bearing no reference to the loan between the parties. |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 13-MR-1286; the Hon. Terence M. Sheen, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Gary L. Taylor and Polina Arsentyeva, both of Rathje & Woodward, LLC, of Wheaton, for appellants.

Richard A. Wohlleber, S. Todd Sipe, and Mark A. Silverman, all of Chapman & Cutler LLP, of Chicago, for appellee.

Panel

JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Justices McLaren and Hudson concurred in the judgment and opinion.

## OPINION

¶ 1     Plaintiffs, Avanti Medical Group, LLC, and Kenneth Barrick, appeal the dismissal of their complaint against defendant, BMO Harris Bank, N.A., for breach of a credit agreement. We affirm because plaintiffs failed to allege that the agreement met the signature requirement in section 2 of the Credit Agreements Act (815 ILCS 160/2 (West 2012)).

¶ 2                           I. BACKGROUND

¶ 3     In their August 2013 complaint, plaintiffs alleged as follows. Kenneth Barrick formed Avanti Medical Group, LLC (Avanti), in 2009 to develop, own, and operate a series of "retail healthcare clinics" in supermarkets. In March 2010, Barrick signed an agreement with SuperValu, Inc., to operate clinics within its stores. SuperValu approved the opening of 70 such clinics. Barrick also signed agreements with several Illinois hospital systems to lend their names exclusively to Avanti's clinics and to refrain from competing with Avanti. The hospital systems included Alexian Brothers Medical Group, Provena, and Elmhurst Memorial Healthcare. At the time, Barrick was employed by Alexian Brothers as an emergency-room physician. With funds from investors, Avanti opened three clinics in the Chicago area. Barrick personally guaranteed the investments.

¶ 4     In the summer of 2011, Barrick applied to BMO Harris Bank, N.A. (BMO), for a loan to fund existing and projected clinics. Barrick met with Matthew Gable, BMO's vice president, to discuss the loan application. Barrick provided Gable with a summary of Avanti's business plan as well as financial information from the three existing clinics. According to plaintiffs, "[t]hroughout their relationship, Gable assured Barrick that BMO was fully committed to funding Avanti's clinics." Also, "Gable, Avanti, and East Trend Corp ('ETC'), conducted meetings and conference calls during which the parties discussed the structure and disbursement of the loan," and "ETC committed to providing a standby letter of credit as collateral securing the loan from BMO."

¶ 5     Plaintiffs alleged that, as a result of Barrick's discussions with Gable, "both Barrick, on behalf of Avanti, and Gable executed" a document on July 12, 2011, entitled "Summary of Terms and Conditions" (Original Terms). Plaintiffs attached a copy of the Original Terms to their complaint. The Original Terms is dated July 12, 2011, and is signed by both Gable and

Barrick. The document sets forth terms of a credit facility of up to $25 million and specifies a closing date of "[n]o later than August 12, 2011."

¶ 6    Plaintiffs alleged that, on July 28, 2011, the Original Terms "[was] amended by written agreement." Plaintiffs alleged that Gable signed this new document, also entitled "Summary of Terms and Conditions" (Amended Terms). Plaintiffs did not, however, allege that Avanti signed the Amended Terms. Plaintiffs attached a copy of the Amended Terms, which is dated July 28, 2011, and bears only Gable's signature. The Amended Terms sets forth terms of a credit facility of up to $10 million–a significant reduction from the amount specified in the Original Terms. The Amended Terms, like the Original Terms, specifies a closing date of "[n]o later than August 12, 2011."

¶ 7    Plaintiffs alleged that, "from the [closing date] on, Avanti had the right, and BMO took on the obligation, to make available the [$]10,000,000 in the form of loans and commercial letters of credit, to be distributed from a BMO escrow account at Avanti's direction."

¶ 8    Plaintiffs further alleged that, "[i]n furtherance of the Amended Terms and in order to enable BMO to release the funds from the escrow account," BMO drafted several documents (collectively, Terms Documents) "to be executed by itself and Avanti." These documents included (1) a "Commercial Account Agreement"; (2) a "Global Treasury Management Services Master Agreement"; (3) a "Secured Account Agreement"; (4) a "Certificate of Account Resolutions–Limited Liability Company" (Certificate); and (5) "W-9 tax forms, FDIC deposit insurance forms, online banking authorization forms, and safekeeping account set-up instructions, all forms necessary to set up the escrow account and finalize the loan." Plaintiffs attached copies of these documents to their complaint as exhibits C through G. Plaintiffs alleged that, "[o]n August 13, 2011, Avanti executed the Terms Document[s] and sent the same back to BMO that day." Several of the Terms Documents have places for both Avanti and BMO to sign, but their mutual signatures appear on only some of them.

¶ 9    Plaintiffs alleged that the "Secured Account Agreement" "acknowledg[ed] that Avanti established an account with BMO specifically for the purpose of drawing funds and making deposits related to the construction and ongoing capital needs of Avanti's clinics." The certificate, plaintiffs stated, "authorize[d] BMO to release the funds to Avanti's subcontractors, vendors, and investors in connection with the clinics." Contrary to these representations, none of the Terms Documents references Avanti's clinics. The Terms Documents are generic, preprinted forms that do not identify any particular loan transaction between the parties.

¶ 10   Plaintiffs alleged that, on August 19, 2011, Gable notified SuperValu that the loan was being finalized but that, because of logistical problems, closing would be delayed until later that month. According to plaintiffs, on "the last day of closing, August 26, 2011, Barrick was notified that BMO would not be going through with the closing." This was "[a]fter Avanti had already executed all necessary documents and met all conditions precedent."

¶ 11   Plaintiffs alleged that BMO's refusal to extend the loan caused Avanti to close its three existing clinics and to forfeit prepayments toward planned clinics. Avanti also lost its exclusivity and noncompetition agreements with the hospital systems, and Alexian Brothers asked Barrick to resign his position. Barrick also became personally liable on the loans from investors that funded the initial three clinics.

¶ 12   Plaintiffs brought four counts in their complaint. Count I sought a declaratory judgment that the Amended Terms "is a valid contractual agreement." Counts II through IV alleged,

respectively, breach of contract, tortious interference with contract, and breach of fiduciary duty.

¶ 13 BMO filed a motion to dismiss the complaint under section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2012)). BMO contended, first, that all four counts were barred by section 2 of the Credit Agreements Act (Act) (815 ILCS 160/2 (West 2012)) because the Amended Terms did not constitute a written credit agreement as defined by section 2. BMO noted that the Amended Terms was not "signed by the creditor and the debtor" (815 ILCS 160/2 (West 2012)) as it bore only Gable's signature. BMO further contended that plaintiffs did not adequately plead that they met the Amended Terms' preconditions for a binding loan commitment. Alternatively, BMO maintained that, even if the Act did not bar the claims, they were deficient under the common law because plaintiffs failed to allege an enforceable contract.

¶ 14 Notably, in citing the Act as a bar, BMO alleged "affirmative matter avoiding the legal effect of or defeating [plaintiffs'] claim[s]" (735 ILCS 5/2-619(a)(9) (West 2012)). Recognizing this, BMO successfully moved, at the hearing on the motion to dismiss, to amend the motion to cite section 2-619(a)(9) of the Code. In fact, the motion to dismiss was a hybrid motion under section 2-619.1 of the Code (735 ILCS 5/2-619.1 (West 2012)).

¶ 15 At the hearing on the motion to dismiss, the trial court determined that the Amended Terms neither by itself nor in connection with other documents cited by plaintiffs satisfied section 2's definition of a written credit agreement. Specifically, the court found that the Amended Terms' provisions on interest and maturity were too indefinite to satisfy the Act's requisites. Also defeating plaintiffs' suit, the court found, was their failure to produce documents indicating that they produced loan security satisfactory to BMO, which the Amended Terms specifically required. The court dismissed the entirety of plaintiffs' complaint with prejudice.

¶ 16 Plaintiffs filed this timely appeal.

¶ 17 II. ANALYSIS

¶ 18 Plaintiffs challenge the trial court's dismissal of their complaint. We agree with the trial court that the Act bars all claims in the complaint. Section 2-619(a)(9) of the Code provides for dismissal of an action where "barred by *** affirmative matter avoiding the legal effect of or defeating the claim." 735 ILCS 5/2-619(a)(9) (West 2012). The Act supplies such "affirmative matter." Section 2 of the Act states:

> "A debtor may not maintain an action on or in any way related to a credit agreement unless the credit agreement is in writing, expresses an agreement or commitment to lend money or extend credit or delay or forbear repayment of money, sets forth the relevant terms and conditions, and is signed by the creditor and the debtor." 815 ILCS 160/2 (West 2012).

We review *de novo* a dismissal under section 2-619(a)(9). *In re Marriage of Murray*, 2014 IL App (2d) 121253, ¶ 34.

¶ 19 "There is no limitation as to the type of actions by a debtor which are barred by the Act, so long as the action is in any way related to a credit agreement." *First National Bank v. McBride Chevrolet, Inc.*, 267 Ill. App. 3d 367, 372 (1994). The bar applies "regardless of whether [the claims] arise out of contract or tort law." *Whirlpool Financial Corp. v. Sevaux*, 874 F. Supp. 181, 188 (N.D. Ill. 1994). Plaintiffs do not dispute that all of their claims are "action[s] on or

*** related to a credit agreement" (815 ILCS 160/2 (West 2012)). The foundational allegation in all four counts, we note, is that the Amended Terms is "a valid contractual agreement."

¶ 20     The focus of plaintiff's challenge on appeal is the trial court's holding that the Amended Terms does not satisfy section 2's requirement of an agreement in writing "[that] expresses an agreement or commitment to lend money or extend credit or delay or forbear repayment of money, sets forth the relevant terms and conditions, and is signed by the creditor and the debtor" (*id.*).

¶ 21     We disagree with plaintiffs that the Amended Terms satisfies section 2's criteria. The most obvious noncompliance is the lack of mutual signatures on the Amended Terms. The document is signed by Gable alone. In the court below, BMO urged the signature issue as a ground for dismissal, and BMO continues to urge it on appeal. The trial court did not base its dismissal on the signature issue, but we can affirm on any ground supported by the record, regardless of whether the trial court relied on it. See *Suchy v. City of Geneva*, 2014 IL App (2d) 130367, ¶ 19.

¶ 22     In their complaint, plaintiffs alleged that Gable signed the Amended Terms but did not allege that Avanti signed it. Consistent with this, the copy of the Amended Terms attached to the complaint shows only Gable's signature. "The Act clearly sets forth that a credit agreement not only must be in writing but also must be signed by both the creditor and debtor." *McAloon v. Northwest Bancorp, Inc.*, 274 Ill. App. 3d 758, 763 (1995). The Act has a more stringent signature requirement than the general statute of frauds, the Frauds Act, which requires only the signature of "the party to be charged" or his agent (see 740 ILCS 80/1 (West 2012)). *McAloon*, 274 Ill. App. 3d at 763. In *McAloon*, this court held that a written loan proposal did not meet section 2's signature requirement when it bore the bank's signature but not the debtor's. *Id.*

¶ 23     In their reply brief, plaintiffs begin their discussion of the signature issue with this declaration: "[T]he Amended Terms is signed by both parties." Reading further, we see that plaintiffs do not mean to defy reality but rather propose a broad notion of what the Amended Terms comprises. Plaintiffs suggest that we treat the Amended Terms and the Terms Documents as a single document and deem it sufficient that the signatures of both parties appear on (some of) the Terms Documents (which number at least five).

¶ 24     Several of the cases plaintiffs cite for this approach do not even involve the Act. They stand for the general contract principle "that in the absence of evidence of a contrary intention, where two or more instruments are *executed by the same contracting parties* in the course of the same transaction, the instruments will be considered together and construed with reference to one another because they are, in the eyes of the law, one contract." (Emphasis added.) *Tepfer v. Deerfield Savings & Loan Ass'n*, 118 Ill. App. 3d 77, 80 (1983). The italicized phrase, "executed by the same contracting parties," casts doubt on the applicability of this rule here, as plaintiffs did not execute the document on which they base their suit: the Amended Terms. In any event, plaintiffs do not explain how *Tepfer* and other decisions applying this common-law rule provide guidance on the *statutory* signature requirement at issue in this case.

¶ 25     Plaintiffs do cite two decisions under the Act: *R&B Kapital Development, LLC v. North Shore Community Bank & Trust Co.*, 358 Ill. App. 3d 912 (2005), and *Bank One, Springfield v. Roscetti*, 309 Ill. App. 3d 1048 (1999). These cases also do not provide guidance on the issue at hand. They stand for the proposition that a document that is not a credit agreement *per se*, such as a personal guaranty on a loan (*Roscetti*) or an agreement for the escrow of loan proceeds

(*R&B Kapital*), may be considered a "credit agreement" under section 2 if it is connected to a *bona fide* credit commitment. See *R&B Kapital*, 358 Ill. App. 3d at 919 ("[T]he escrow agreement was an integral part of the comprehensive credit agreement the plaintiff[-borrower] entered into with [the defendant-lender]."); *Roscetti*, 309 Ill. App. 3d at 1058 ("The guaranty, together with the note, the floor plan, and possibly other documents, constituted the comprehensive credit agreement."). The *Roscetti* court observed:

> "A credit agreement often consists of several documents that, together, create the terms of the extension of credit. *** Significantly, the Act does not limit the definition of 'credit agreement' to being a single document." *Roscetti*, 309 Ill. App. 3d at 1058.

¶ 26    The courts in these cases did not mention section 2's signature requirement, nor did their conclusions rest on a tacit interpretation of the signature requirement. The courts focused on the substance of the documents, not on which parties signed which document.

¶ 27    Based on the parties' briefs and our own research, we find that no Illinois court has decided whether documents may be aggregated to meet the signature requirement of section 2 of the Act. *McAloon* applied the signature requirement, but there was no issue in that case about multiple documents. Looking to federal courts that apply Illinois law, we note that this precise issue was presented to the Seventh Circuit Court of Appeals in *Help At Home, Inc. v. Medical Capital, L.L.C.*, 260 F.3d 748 (7th Cir. 2001). See *In re Consolidated Objections to Tax Levies of School District No. 205*, 306 Ill. App. 3d 1104, 1113 (1999) (the decisions of federal courts on points of Illinois law are persuasive authority alone).

¶ 28    In *Help At Home, Inc.*, the plaintiff (HAH) sued to enforce an alleged commitment by Medical Capital, L.L.C. (MedCap), to extend credit to cover a loan that HAH had outstanding with Harris Bank. The document that memorialized the terms of the agreement, the " 'Sale and Servicing Agreement' " (SSA), was signed by HAH but not by MedCap. MedCap sent HAH for its signature various Uniform Commercial Code (UCC) (810 ILCS 5/9-101 *et seq.* (West 2012)) financing documents that gave MedCap a security interest in HAH's accounts receivable, inventory, and other items. HAH signed all of these UCC documents, but MedCap signed only some. MedCap also sent HAH a commitment letter stating that MedCap would, at closing, extend HAH financing to cover the Harris Bank loan. The letter was signed by MedCap and did not require HAH's signature. MedCap later refused to extend credit, and HAH brought suit. MedCap moved to dismiss the suit as barred by the Act. The district court agreed that the Act barred the suit because the documents on which HAH relied did not meet section 2's signature requirement. *Help At Home, Inc.*, 260 F.3d at 751-52.

¶ 29    In the appellate court, HAH contended that MedCap's signature on the SSA was unnecessary because the SSA, the commitment letter, and the UCC documents were all part of a single transaction and, therefore, it sufficed that HAH and MedCap both signed at least some of the UCC documents. The appellate court defined the issue as "whether multiple documents may be aggregated to satisfy the signature requirement of Section 2 of the [Act]." *Id.* at 756. HAH cited *Roscetti* to support its reading of section 2, but the appellate court found that decision of no guidance on section 2's signature requirement:

> "[*Roscetti*] addresses the question of whether a credit agreement, as defined in Section 1 of the [Act], can be comprised of multiple documents, and it resolves that question in the affirmative. However, [*Roscetti*] gives us no indication of which parties had signed which documents and does not even mention the signature requirement of Section 2 of the [Act]. Although HAH suggests that, under [*Roscetti*], the [Act] is

satisfied when each party signs one of the documents comprising the credit agreement, it would be just as consistent with [*Roscetti*] to assert that both parties must sign all of the documents. Indeed, the latter assertion may be more consistent with the express terms of the [Act]. In short, [*Roscetti*] sheds little, if any, light on the question of whether multiple documents may be aggregated to satisfy the signature requirement of Section 2 of the [Act], which is the question we must answer in this case." *Id.*

¶ 30        The court in *Help At Home, Inc.* declined to decide "this heretofore unanswered question of state law," because even if it assumed that HAH could "rely on multiple documents to satisfy the [Act's] signature requirement," the court "still would have to conclude that the documents the parties signed *** were insufficient." *Id.* This was because the documents that were signed by both parties, or at least by MedCap,[1] "simply [did] not encompass the entire loan agreement." *Id.* at 757.

¶ 31        Having found only nonbinding authority on this issue, we ourselves examine the language of section 2. The goal of statutory interpretation is to ascertain the intent of the legislature, the best indication of which is the statutory language accorded its plain and ordinary meaning. *Nowak v. City of Country Club Hills*, 2011 IL 111838, ¶ 11. Section 2 permits a suit based on, or related to, a credit agreement that "is in writing ***, sets forth the relevant terms and conditions, and is signed by the creditor and the debtor." 815 ILCS 160/2 (West 2012). We need not decide the full outlines of the signature requirement to decide the present case. It suffices for this case that we draw from section 2 a requirement that "the relevant terms and conditions" of the loan be discernible from documents that bear the signatures of both the creditor and the debtor. We leave for another day such questions as whether and to what extent a party is permitted to piece together the terms and conditions of a loan from multiple documents, not all of which bear the signatures of both the creditor and the debtor. In this case, the only document that sets forth *any* of the loan terms is the Amended Terms, but it is signed by Gable alone. The only documents that bear the signatures of both the creditor and the debtor are some of the Terms Documents. These, however, are generic, preprinted forms that do not reference any particular loan between the parties. Thus, the fact that the Terms Documents were, allegedly, executed contemporaneously with the Amended Terms does not bear on the signature issue.

¶ 32        Therefore, as the agreement on which plaintiffs base their suit does not meet section 2's requirement of mutual signatures, plaintiffs' action is barred under the Act. As the signature issue is a sufficient ground for affirming the trial court's dismissal of plaintiffs' complaint, we need not address the remaining grounds urged by BMO.

¶ 33                                    III. CONCLUSION
¶ 34        For the foregoing reasons, we affirm the judgment of the circuit court of Du Page County.

¶ 35        Affirmed.

---

[1]We do not agree with the court's seeming insinuation here that the creditor's signature would have sufficed. Section 2's dual-signature requirement distinguishes it from the Frauds Act, which requires only the signature of "the party to be charged" or his agent (740 ILCS 80/1 (West 2012)).