# Illinois Official Reports

## Appellate Court

> ### *Van Pelt Construction Co. v. BMO Harris Bank, N.A.*,
> ### 2014 IL App (1st) 121661

Appellate Court
Caption

VAN PELT CONSTRUCTION COMPANY, INC., Plaintiff and
Counterdefendant, v. BMO HARRIS BANK, N.A., f/k/a Harris Bank,
N.A., as Assignee of Amcore Bank, N.A., Defendant, Counterplaintiff
and Third-Party Plaintiff-Appellant (BWA, Inc., Defendant and
Counterdefendant-Appellee; Unknown Owners and Nonrecord
Claimants, Defendants and Counterdefendants; Albert Belmonte,
Allen Kutchins, Angelos Mitroussias, Danny Karalis, Dorance
Lorenzo Padron, Pedro Cevallos Candau, Rogelio Llamedo, and Rosa
Gonzalez, Third-Party Defendants-Appellees; and James Papas and
Luis Flocco, Third-Party Defendants).–VAN PELT
CONSTRUCTION COMPANY, INC., Plaintiff and Counter-
defendant, v. BMO HARRIS BANK, N.A., f/k/a Harris Bank, N.A.,
as Assignee of Amcore Bank, N.A., Defendant, Counterplaintiff and
Third-Party Plaintiff-Appellant (BWA, Inc., Defendant and
Counterdefendant-Appellee; Unknown Owners and Nonrecord
Claimants, Defendants and Counterdefendants; Albert Belmonte,
Allen Kutchins, Angelos Mitroussias, Danny Karalis, Dorance
Lorenzo Padron, Pedro Cevallos Candau, Rogelio Llamedo, and Rosa
Gonzalez, Third-Party Defendants-Appellees; and James Papas and
Luis Flocco, Third-Party Defendants).

District & No.          First District, Fourth Division
                        Docket Nos. 1-12-1661, 1-12-2075 cons.

Filed                   March 27, 2014
Rehearing denied        April 23, 2014

**Held**

(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*)

The trial court's order granting the emergency motion filed by the guarantors of a mortgage seeking the enforcement of a purported settlement by which the guarantors would be released from their obligations under the mortgage upon the tender of a deed in lieu of foreclosure and an amount of cash was reversed on the ground that the settlement was unenforceable under the Credit Agreements Act, since the forebearance required of the mortgagee under the agreement brought it within the scope of the Act, but there was no proof of a meeting of the minds as to the terms of the agreement, especially in the absence of a recitation of the names of all parties to be bound, a statement of the specific property to be transferred in the deed in lieu of foreclosure, a deadline for the parties' performance, or a definition of how a determination was to be made as to whether the guarantors experienced an "upward variance" in their personal financial conditions that would negate the agreement.

Decision Under Review

Appeal from the Circuit Court of Cook County, No. 08-CH-45136; the Hon. Robert J. Quinn, Judge, presiding.

Judgment

Reversed and remanded.

Counsel on Appeal

Kurt M. Carlson and Martin J. Wasserman, both of Carlson Dash, LLC, of Chicago, for appellant.

Thomas Rosenwein, of Glickman, Flesch & Rosenwein, of Chicago, for appellees.

Panel

JUSTICE LAVIN delivered the judgment of the court, with opinion. Justices Fitzgerald Smith and Epstein concurred in the judgment and opinion.

**OPINION**

¶ 1     This appeal arises from the trial court's order enforcing a settlement agreement purportedly entered into between mortgagee BMO Harris Bank, N.A., f/k/a Harris Bank, N.A. (Harris), as assignee of Amcore Bank, N.A. (Amcore), and mortgagor BWA, Inc. (BWA), as well as several guarantors of related promissory notes executed in Harris/Amcore's favor. Pursuant to the alleged settlement agreement, Harris agreed to accept $350,000 and a deed in lieu of

foreclosure in place of the greater amount due. On appeal, Harris asserts that (1) the settlement agreement was unenforceable under the Credit Agreements Act (the Credit Act) (815 ILCS 160/0.01 *et seq.* (West 2010)) and the Frauds Act (740 ILCS 80/0.01 *et seq.* (West 2010)); (2) no evidence showed that Harris's attorney had the authority to enter into the agreement; (3) no settlement agreement was reached; and (4) the condition precedent to Harris's duty under the agreement was not satisfied. We agree with Harris's assertion that the alleged settlement agreement failed to satisfy the Credit Act. Accordingly, we reverse and remand for further proceedings.

¶ 2                                                    I. BACKGROUND

¶ 3        We recite only those facts necessary to resolve the issues raised on appeal. The record indicates that in 2008, BWA borrowed money from Amcore in order to purchase real estate located at 43 West Dundee Road in Wheeling, Illinois (the Property), and build a bank thereon. Specifically, BWA granted Amcore a mortgage on the Property, secured by two promissory notes. In addition, the 10 organizers of BWA (Albert Belmonte, Allen Kutchins, Angelos Mitroussias, Danny Karalis, Dorance Lorenzo Padron, Pedro Cevallos Candau, Rogelio Llamedo, Rosa Gonzalez, James Papas and Luis Flocco) signed commercial guaranties promising to pay any and all of BWA's indebtedness. Afterward, however, BWA failed to raise the necessary capital and the planned bank never materialized.

¶ 4        In December 2008, plaintiff Van Pelt Construction Company, Inc. (Van Pelt), commenced this action by filing a complaint against BWA and Amcore, seeking foreclosure of Van Pelt's mechanic's lien on the Property.[1] In September 2009, Amcore filed a counterclaim against BWA and a third-party complaint against the 10 guarantors, the pleading that ultimately led to the dispute before us. Count I of Amcore's pleading sought to foreclose BWA's mortgage on the Property while counts II and III asserted that BWA breached the promissory notes. At that time, the total amount due under the two promissory notes was approximately $1.5 million. In addition, counts IV through XIII individually asserted that each guarantor had breached his or her respective guaranty to pay BWA's indebtedness. Subsequently, in July 2010, the trial court granted Harris's motion to substitute itself for Amcore, as the loan documents at issue were acquired by Harris after Amcore was taken over by the Federal Deposit Insurance Corporation.[2]

¶ 5        Throughout these proceedings, attorney Kent Maynard represented BWA and all guarantors with the exception of Papas, who was represented by other counsel, and Flocco, who was discharged in bankruptcy proceedings (the Maynard guarantors). In August 2010, BWA and the Maynard guarantors filed an answer denying that they had failed to pay amounts due. Meanwhile, Maynard and counsel for Harris/Amcore had begun settlement negotiations. These negotiations occurred mostly in the form of more than a year's worth of emails between Maynard and Harris's counsel, originally Tzivia Masliansky of Much Shelist Denenberg Ament and Rubenstein, P.C. Throughout these negotiations, the parties attempted to resolve

---

[1]Van Pelt is not a party on appeal and the issues before us do not pertain to Van Pelt's claims.

[2]The trial court later granted Harris leave to add a counterclaim against Van Pelt due to its interest in the Property. Ultimately, the trial court entered an agreed order between the two parties stating that Harris's mortgage lien was superior to Van Pelt's mechanic's lien.

their differences regarding the guarantors' ability to pay, the mechanism for determining whether they had experienced an increase in that ability, Papas's role in any settlement, and the settlement amount. Harris apparently believed the guarantors may have understated the strength of their financial circumstances.

¶ 6                                        A. Communications With Masliansky

¶ 7        In March and April 2010, the two attorneys communicated regarding the guarantors' personal financial statements and 2008 tax returns, which Maynard was to provide to Masliansky. On August 19, 2010, Maynard told Masliansky that he had been authorized to offer a deed in lieu of foreclosure and $200,000 to settle all claims. That offer was not accepted. On November 15, 2010, Masliansky emailed Maynard that she had spoken with her client, who demanded $475,000 as well as a deed in lieu of foreclosure to settle all claims. The next day, Maynard inquired whether Masliansky's client would consider settlement with fewer than all of the guarantors or was willing to negotiate release prices with individual guarantors. She responded that Harris was not willing to do so. The record indicates that following a phone conversation on December 13, 2010, she told Maynard that she had conveyed an offer he had made to Harris, who countered at $450,000 with a deed in lieu of foreclosure. After further dickering, Maynard responded with an offer of $350,000.

¶ 8        According to Maynard's clients, the emails written a week later on December 20 and 21 of 2010 culminated in the settlement agreement at issue. On the former date, Masliansky confirmed that she had received the counteroffer of $350,000 and asked how soon Maynard's clients could provide updated personal financial statements in order for Harris to consider the offer. Maynard then reminded Masliansky of the "lengthy and cumbersome ordeal" in gathering that information and expressed his belief that requiring updated financial information would "be more trouble than it is worth–and would, if anything, show that the various guarantors have continued to suffer diminution of their wealth." Maynard then asked whether Masliansky could respond to his clients' last counteroffer.

¶ 9        Later that day, Maynard wrote Masliansky a second email confirming the details of another telephone conference and asked her to correct any misstatements. According to Maynard, Masliansky understood that Maynard did not represent Papas and that Maynard's settlement offer did not include him. Masliansky also *believed* that the counteroffer of $350,000 and a deed in lieu of foreclosure, when aggregated with a settlement amount negotiated separately with Papas, would be acceptable to Masliansky's client; "*provided however that*, [Harris] cannot confirm that $350,000 from [the Maynard guarantors] is acceptable and enter into a binding settlement agreement until it has received and reviewed updated financial statements from all of the Guarantors whom I represent." (Emphasis in original.) In contrast to those representations, Maynard stated, in a third email to Masliansky that day, that a client reminded him that Papas had previously committed to contribute toward the settlement and his contribution had been included in the Maynard guarantors' last counteroffer. Therefore, Maynard's clients were actually prepared to offer only $325,000 toward settlement exclusive of any contribution from Papas, "with the settlement contingent–as you requested–on submission of updated financials, so long as your client agrees that the settlement amount will become final in the event that the updated financials do not show, in the aggregate, a substantial increase in net worth." Maynard further stated that they could negotiate the definition of "substantial increase."

- 4 -

¶ 10     The next morning, December 21, 2010, Masliansky responded that this was the first she had heard of Papas being included in Maynard's amount so she would need to discuss it with Harris. Masliansky emailed Maynard minutes later, stating that "[t]he offer will be subject to the review of the financials. If the guarantors' financials show[ ] that they have the ability to settle for more, then the $350,000 [*sic*] will not [be] the final $$ amount." Shortly thereafter, Maynard asked, "Can we agree that if the updated financials do NOT show an upward variance in the guarantors' aggregate net worth, then the settlement number will become binding and effective?" Maynard stated, "This gives my clients some comfort that we have a deal unless the updated financials show a substantial improvement (which I am told is not the case)." Masliansky did not specifically answer Maynard's question but replied, "Take out the words 'substantial improvement' and let's just leave it at 'upward variance.' If the financials show any upward variance, the $350,000 [*sic*] is off the table."

¶ 11     That same day, Maynard further attempted to define "upward variance." He proposed that no upward variance would occur if the group of guarantors, other than Flocco, did not report an aggregate net worth greater than that reported in the previous financial statements tendered. Masliansky rejected Maynard's proposed test and stated, "Just give us the updated financials ASAP, and the Bank will decide whether or not the financials support the offer of $350,000, or if the guarantors are able to pay more." The next day, on December 22, 2010, Masliansky informed Maynard that Papas's counsel said Papas would not participate in the settlement offer made by Maynard's clients. Maynard responded, "That is news to me."

¶ 12     On January 3, 2011, Maynard emailed Masliansky to memorialize a conversation between the two attorneys and asked her to respond if any of the following representations were incorrect: (1) Papas said he would not contribute to any settlement; (2) Harris would release all guarantors for a deed in lieu of foreclosure and $350,000, regardless of the source of those funds and regardless of Papas's involvement, "subject to final approval" after Harris had reviewed updated personal financial statements; (3) "The bank will *not* finally approve the foregoing $350,000 settlement until it has received and reviewed *all* of the updated PFSs, including those three which have not yet been provided"; and (4) Masliansky acknowledged that Maynard did not represent Papas but suggested that he attempt to persuade him to provide an updated personal financial statement if the other guarantors wished to close the settlement at $350,000. (Emphases in original.) Later that afternoon, Masliansky confirmed that Maynard's recitation of the conversation was accurate. A week later, on January 10, 2011, Maynard advised Masliansky, "I have settlement authority of $350,000.00, plus a deed in lieu, in consideration of a release of all guarantors." At that point, Martin J. Wasserman of Carlson Dash replaced Masliansky as counsel for Harris.

¶ 13                    B. Communications Following Harris's Change in Counsel

¶ 14     On February 20, 2011, Maynard emailed Wasserman to thank him for his phone call in which he "advised that [Harris] is willing to settle its claims against my nine clients in the captioned litigation (I represent all of the ten guarantors *except* Mr. James Papas, who is represented by Mr. Perry Callas), for a deed in lieu and a payment of $350,000." (Emphasis in original.) Minutes later, Wasserman responded that "the terms your e-mail contains are not the exact terms we discussed. As a reminder, we discussed how a [deed in lieu of foreclosure] could serve to release any guarantors who are not included in the settlement agreement and *** specifically how this poses a problem as to Mr. Papas. We were both going to try to come up

with a creative solution to this problem." Further dialogue then ensued regarding Wasserman's concern that releasing the Maynard guarantors would have the legal effect of releasing Papas as well, an undesirable result from Harris's perspective.

¶ 15  On March 9, 2011, Callas, Papas's attorney, wrote to Wasserman regarding an inaccurate 2010 financial statement that Papas had previously provided when he scratched out the date on his 2009 financial statement and wrote "2010." Callas essentially explained that Papas's finances were actually worse in 2010 than in 2009 and provided an accurate updated statement. In addition, Callas stated, "It is my understanding that you had worked up a settlement for $350,000.00 and a deed in lieu of foreclosure. Mr. Papas cannot make any substantial separate offer to you of any amount which would increase that amount." Callas further stated, "It would seem to me the best thing would be for Mr. Papas to participate in the $350,000.00 settlement to the extent that he can because it seems that the partners are willing to adjust whatever contributions have to be made in order to terminate this problem that they have." A week later, Callas wrote that he was "perplexed why you are singling out Mr. Papas after you made a group decision to settle the matter for $350,000.00[.] Mr. Papas is part of that group and would have to work out some arrangement with the other organizers of the bank who were also guarantors to make some contribution to the $350,000.00. Why you are suddenly singling him out because you think he has a better financial statement than some of the other people is bewildering to me."

¶ 16  On July 14, 2011, Maynard sent Wasserman an email to confirm a recent conversation in which Wasserman allegedly said he would file a motion for summary judgment if, by July 28, 2011, the guarantors had not provided a matrix showing their respective contributions to the settlement and the guarantors' most recent tax returns and/or personal financial statements. Maynard added that Harris agreed that Papas "may be among the parties released in consideration of the settlement amount of $350,000." Shortly thereafter, Maynard sent Wasserman a second email stating that if Maynard's clients could not reach a consensus as to how to allocate the full settlement amount, "then you will consider negotiating separate settlement agreements with individual guarantors." Wasserman responded, "I do not believe your summary accurately describes our conversation." Wasserman then indicated that his client would be filing a motion for summary judgment in the immediate future. "Until such time that a settlement has been finalized, we have been instructed to move the case along."

¶ 17  Karalis, one of the Maynard guarantors, emailed Wasserman that same day regarding their recent phone conversation. Karalis represented that he had previously tendered a $50,000 check to Maynard as part of the proposed $350,000 settlement but, "[u]nfortunately, the group effort has stalled." Karalis then stated that he wanted to enter into a separate settlement agreement with Harris. Apparently, that never occurred.

¶ 18  On August 5, 2011, Maynard asked Wasserman to provide the form of settlement agreement acceptable to Harris so that Papas's lawyer, now Konstantine Sparagis, could approve of the form and transfer Papas's $25,000 contribution to Maynard. A few days later, Maynard informed Wasserman that Maynard hoped to have commitments for the entire settlement amount by the end of that day. Wasserman responded, "I wanted to once again make it clear *** that I have been instructed to move this case forward towards judgment and will be filing a summary judgment motion in the next couple days." Minutes later, Maynard told Wasserman that Maynard's clients were "nonetheless proceeding on the assumption that you will not reject a tender of the full $350,000 settlement amount, along with the requested

schedule identifying the amount of each guarantor's contribution." Maynard asked Wasserman to reply if this was incorrect. Wasserman then reiterated that Harris was moving forward with the case. "If you would like to revisit settlement, please submit all the information previously requested. At that time[,] the bank will review and make a decision regarding settlement." Following further communication between the attorneys, Wasserman stated, "I think I have made it clear multiple times that if you provide all the information previously requested by the bank, the bank will review the settlement offer. At that time it is possible the bank *** will need further information to decide on the offer. Until the time that we have an agreement (which we do not have now) we are moving forward with the case."

¶ 19     On August 10, 2011, Maynard informed Wasserman that the $350,000 settlement amount had been fully committed by the guarantors. Maynard said his clients would have good funds totaling $320,000 in his Interest on Lawyers' Trust Account (IOLTA) by Friday, which, when combined with Papas's $30,000 contribution, represented the full commitment. Within the hour, Wasserman responded, "[l]ike I have mentioned multiple times before[,] the bank had previously decided to move forward with the case and until the time the bank approves this offer we do not have a settlement." Consistent with Wasserman's response, Harris filed a motion for summary judgment and judgment of foreclosure and sale that same day. Harris requested that a judgment be entered in the amount of $1,880,939.61.

¶ 20     Two weeks later, Wasserman emailed Maynard a letter relaying that Harris had rejected the guarantors' offer. Harris had found that the offer was not aligned with the ability of Maynard's clients to pay. Harris then offered the following settlement: "In exchange for a full release of your clients' obligations to the bank, your clients will provide good and marketable title to the mortgaged property, free and clear of any liens and a $525,000.00 cash payment." Two days later, Maynard responded that Wasserman's letter was too problematic to discuss in his response. Maynard stated he would speak to his clients and urged Wasserman to consult with Masliansky, "the lawyer who spoke for your client at the time settlement was negotiated."

¶ 21     A flurry of correspondence then ensued. Attorney Kurt Carlson of Carlson Dash told Maynard that Masliansky was no longer employed by Much Shelist but more importantly, everyone knew that "[a]t all times, the settlement proposed was conditioned on the bank being comfortable with personal financials." Carlson further stated that "Banks are regulated by the fed ***. *** [T]hey cannot simply settle an obligation without due diligence to assure [that] the settlement of a valid, legal obligation owing to a federally insured institution is well grounded and supported by the facts and circumstances of their obligors." Carlson later elaborated that "every settlement with a bank is conditioned upon the bank verifying personal financials"; "[t]his is not a new or novel theory." Carlson also stated that according to Masliansky, she had made this clear in her communications with Maynard. In addition, Carlson essentially stated that in light of Maynard's experience, he was surely aware of this as well as the difficulties presented by the differing personal financial statements presented. Maynard subsequently asked for clarification as to how the bank reached the determination that the guarantors' offer was not aligned with their ability to pay. Specifically, Maynard asked, "Is it your position that the ability to pay of one or more of my clients changed materially after the $350,000 settlement amount was negotiated? If so, which guarantor(s) do you include in that category, and why?" A couple hours later, Maynard emailed both Wasserman and Carlson, stating that based on Masliansky's correspondence on December 21, 2010, Harris could not withdraw the $350,000 settlement amount absent a showing of upward

variance in the personal financial statements and that to Maynard's knowledge, no upward variance had occurred.

### C. Motion to Enforce the Alleged Settlement Agreement

On September 12, 2011, BWA and the Maynard guarantors filed an emergency motion to enforce the purported settlement agreement with Harris, alleging that on December 21, 2010, the parties agreed to settle this case for a deed in lieu of foreclosure and a $350,000 payment. The motion also stated that the "Guarantors readily concede that the Settlement amount was subject to an upward adjustment, in the event that personal financial disclosures by the guarantors show an upward revision in their ability to pay. That, however, did not occur." In response, Harris stated, in pertinent part, that while the parties came close to reaching a settlement agreement, it never came to fruition. Harris argued that even if a settlement agreement was reached, it failed to comply with the Credit Act because it was not in writing and signed by the parties. Maynard's clients subsequently disputed that the Credit Act applied, arguing that the settlement did not constitute a credit agreement under that act.

A lengthy evidentiary hearing then commenced on the motion to enforce the purported settlement agreement. The testimony of Maynard, Wasserman and Callas generally pertained to the contents of the aforementioned emails and the attorneys' understanding thereof. Maynard's understanding that the parties had a settlement agreement was derived largely from the attorneys' email correspondence. In addition, we note that Callas testified that any information he had with respect to settlement would have come through Maynard or Wasserman, rather than first hand participation in the negotiations. Moreover, the parties testified regarding the financial circumstances of Papas and Belmonte.

On May 16, 2012, the trial court entered a written order finding that "the agreement of the parties, Harris and the Settlement Guarantors through their respective counsel on January 3, 2011 constituted a binding settlement agreement." Specifically, the court found that "[t]he discussions which occurred between December 19th and 22nd contain piecemeal assent to terms which, when read together, constitute the material conditions by which the parties agreed to be governed." The court also found, however, that counsel's email exchanges on January 3, 2010, contained a more definite expression of the agreement's terms. Specifically, Maynard's email to Masliansky that day memorialized the settlement amount, responsibilities of the guarantors, the parties to be bound, and contingencies to performance. In addition, Masliansky's response confirming the accuracy of Maynard's representations expressed her assent. The court also determined that Harris's acceptance of terms in no way hinged on the financial contribution of Papas and that the "upward variance" condition went solely to the parties' obligation to perform. Moreover, the court essentially found the parties' intentions were that Harris would be required to execute the agreement if review of the updated financials did not disclose an increase in an individual guarantor's liquidity, rather than an increase in the aggregate liquidity of the guarantors. The court further found Harris had not shown an increase in the ability of either Papas or Belmonte to pay. Finally, the court concluded that the settlement agreement was not a new credit agreement but, rather, was a mere modification of an existing agreement that did not invoke the Credit Act.

### II. ANALYSIS

¶ 27    On appeal, Harris asserts that the trial court erroneously found the parties had entered into an enforceable settlement agreement. We begin by addressing Harris's contention that the Credit Act barred enforcement of the alleged agreement. Although testimony was presented at an evidentiary hearing, resolution of this issue depends solely on the emails themselves, *i.e.*, documentary evidence, and consideration of the Credit Act. Thus, the credibility of the witnesses is not at issue and the trial court was in no better position than this court is now. Accordingly we review this contention *de novo*. *Barnes v. Michalski*, 399 Ill. App. 3d 254, 264 (2010). Under any standard of review, however, we would find the Credit Act barred enforcement of the alleged settlement agreement.

¶ 28    Section 1(1) of the Credit Act defines "Credit agreement" as "an agreement or commitment by a creditor to lend money or extend credit or delay or forbear repayment of money not primarily for personal, family or household purposes, and not in connection with the issuance of credit cards." 815 ILCS 160/1(1) (West 2010). Section 2 of the Credit Act states that "[a] debtor may not maintain an action on *or in any way related to* a credit agreement unless the credit agreement is in writing, expresses an agreement or commitment to lend money or extend credit or delay or forbear repayment of money, sets forth the relevant terms and conditions, and is signed by the creditor and the debtor." (Emphasis added.) 815 ILCS 160/2 (West 2010). Thus, the Credit Act is broadly worded and was intended to extend beyond the existing Frauds Act (740 ILCS 80/0.01 *et seq.* (West 2010)). See *McAloon v. Northwest Bancorp, Inc.*, 274 Ill. App. 3d 758, 762-64 (1995). "There is no limitation as to the type of actions by a debtor which are barred by the Act, so long as the action is in any way related to a credit agreement." *First National Bank in Staunton v. McBride Chevrolet, Inc.*, 267 Ill. App. 3d 367, 372 (1994). This is true even in the face of harsh results. *Id.*

¶ 29    Moreover, section 3 of the Credit Act clarifies the scope of the act, stating, in pertinent part, as follows:

> "The following actions do not give rise to a claim, counter-claim, or defense by a debtor that a *new credit agreement* is created, unless the agreement satisfies the requirements of Section 2:
>
> * * *
>
>    (3) *the agreement by a creditor to modify or amend an existing credit agreement* or to otherwise take certain actions, such as entering into a new credit agreement, *forbearing from exercising remedies in connection with an existing credit agreement*, or rescheduling or extending installments due under an existing credit agreement." (Emphases added.) 815 ILCS 160/3 (West 2010).

Thus, an agreement to modify an existing credit agreement, or forbear from exercising remedies connected with an existing agreement, can give rise to a claim or defense that a new agreement has been formed, so long as the agreement satisfies section 2.

¶ 30    Having considered the aforementioned provisions, we find the purported agreement, which effectively modified an existing agreement by requiring Harris to forbear from exercising its remedies and right to repayment, is clearly the type of agreement encompassed by the act. In addition, we find the Maynard guarantors' suggestion that they are not attempting to maintain a defense based on a new credit agreement, to be disingenuous. They clearly filed their motion to enforce a settlement agreement in defense of Harris's action seeking to enforce an earlier credit agreement, *i.e.*, the mortgage documents. Moreover, we are not persuaded by the trial court's contrary determination, which relied on the unpublished memorandum opinion in *Fidelity*

*Mutual Life Insurance Co. v. American National Bank & Trust Co. of Chicago*, No. 93 C 2851, 1994 WL 14635 (N.D. Ill. Jan. 20, 1994). See *Montes v. Taylor*, 2013 IL App (4th) 120082, ¶ 21 (observing that federal district court decisions may be persuasive but are not binding).

¶ 31 In *Fidelity*, the court found that "[s]ection 3 states that agreements to modify existing credit agreements are not credit agreements." *Fidelity Mutual Life Insurance Co.*, No. 93 C 2851, at *4. The *Fidelity* court then found that the settlement agreement between the parties for an amount less than that owed by the debtor pursuant to the original agreement did not involve a claim or defense by a debtor that a new credit agreement was created and thus, the Credit Act did not apply. *Id.* Contrary to *Fidelity*'s reading of section 3, however, the plain language of the statute contemplates that an agreement to modify an existing credit agreement can itself be a new credit agreement.

¶ 32 In contrast, we find the appellate court's prior decision in *Teachers Insurance & Annuity Ass'n of America v. La Salle National Bank*, 295 Ill. App. 3d 61, 70 (1998), to be instructive. There, the appellate court determined that where the parties' original written agreement did not require the creditor to restructure the loan at issue, their subsequent agreement to that effect fell within section 3 of the Credit Act and thus, could not be enforced absent a signed writing. *Id.* Similarly, here, the Maynard guarantors have cited nothing in the parties' original agreement that required Harris to accept a lesser sum than what was otherwise due.

¶ 33 We also reject the Maynard guarantors' assertion that "[b]uying a permanent respite from litigation, in consideration of a payment of monetary consideration and a deed in lieu, is not forbearance or delay in the enforcement of a creditor's rights under a credit agreement." While it is true that the effect of the settlement agreement would be to extinguish the present litigation, the Maynard guarantors ignore that the means to that end involve Harris forbearing from collecting the remaining sum due and from exercising its right to foreclose on the Property. See Merriam-Webster's Collegiate Dictionary 455 (10th ed. 1998) (defining forbear as to hold back). In addition, we find no reason why the legislature would find the importance of temporary forbearance, which requires a signed writing under the Credit Act, to be of greater importance than permanent forbearance. See *Resolution Trust Corp. v. Thompson*, 989 F.2d 942, 943-44 (7th Cir. 1993) (finding loan forgiveness to be a credit agreement under the Credit Act); *Westinghouse Electric Corp. v. McLean*, 938 F. Supp. 487, 491 (N.D. Ill. 1996) (rejecting the hypertechnical distinction between forbearance and forgiveness, a distinction that would be inconsistent with the broad reading of the Credit Act).

¶ 34 Having determined that the Credit Act applies, we now determine whether the record supports the trial court's finding that an enforceable settlement agreement existed, an inquiry governed by section 2. Initially, we note that precious little proof exists that a meeting of the minds occurred here. Even if that did occur, the emails at issue do not evince the relevant terms of that agreement (see 815 ILCS 160/2 (West 2010)), regardless of whether an agreement was formed on December 21, 2010, as suggested by the Maynard guarantors, or January 3, 2011, as found by the court.

¶ 35 Those emails do not recite the names of every party to be bound (indisputably relevant terms) or expressly incorporate other documents that recite those names. In addition, we note that although the attorneys' emails on January 3, 2011, clearly indicated that Papas was not part of any settlement agreement at that time, it left open the possibility that he would contribute. Indeed, Harris still wanted Papas's financial statement and Papas ultimately did attempt to contribute $30,000. See also *Hubbard Street Lofts LLC v. Inland Bank*, 2011 IL App

(1st) 102640, ¶ 25 (the Credit Act barred the debtor's claim that an agreement existed to apply 8.000% interest for 365 days where the Note relied on actually prescribed the 365/360 method for calculating interest). We also note that the parties' emails did not set forth the specific property to be transferred in the deed, did not specify the legal instruments to be rendered inoperable by the agreement and provided no deadlines for the parties to fulfill their obligations under the agreement. In addition, those writings never set forth how the parties were to determine whether an upward variance occurred, a subject matter that was clearly relevant to Maynard's clients, as shown by his multiple attempts to define that term. Although the court inferred that the parties intended that upward variance in ability to pay contemplated an increase in an individual guarantor's liquidity, the parties' writings never set forth that definition. Simply put, any unwritten understanding by the parties has no bearing on whether the Credit Act has been satisfied. Even when reading the emails together, the relevant terms cannot be found in those writings.

¶ 36 BWA and the Maynard guarantors have also failed to develop any argument specifying where the signatures of the creditor and each debtor can be found in the writings at issue. See *Bartlow v. Costigan*, 2014 IL 115152, ¶ 52 (a reviewing court is entitled to cohesive arguments). It is undisputed that none of the guarantors personally signed any of these writings. See also *Guel v. Bullock*, 127 Ill. App. 3d 36, 39 (1984) (pursuant to the statute of frauds, an attorney lacks authority to sign as the client's agent unless the attorney's specific authority to bind the client is in writing); *McMillan v. Ingolia*, 87 Ill. App. 3d 727, 730-31 (1980) (where no writing expressly authorized the attorney to bind clients to a contract, the attorney's signature could not have bound his clients for the purposes of the statute of frauds). In addition, Papas's attorney did not even ascribe his name to the emails written on the December and January dates. Furthermore, Harris asserts that although Masliansky had the authority to negotiate on its behalf, she did not have the requisite express authority to enter into the purported settlement agreement. See *Shapo v. Tires 'N Tracks, Inc.*, 336 Ill. App. 3d 387, 399 (2002) (a client will not be bound by his attorney's *out-of-court* settlement absent proof of the attorney's express authority, whereas the existence of an attorney's authority to settle in *open* court is presumed absent evidence to the contrary); *Blutcher v. EHS Trinity Hospital*, 321 Ill. App. 3d 131, 136-37 (2001). This is corroborated by Masliansky's repeated assertions that settlement was subject to Harris's review. Although BWA and the Maynard guarantors argue Harris forfeited the right to challenge the extent of Masliansky's authority, a valid signature by the parties was at issue in this case from the moment Harris asserted that the agreement did not satisfy the Credit Act. See *Help at Home, Inc. v. Medical Capital, L.L.C.*, 260 F.3d 748, 755 (7th Cir. 2001) (observing that section 2 of the Credit Act required the signature of both parties and that the signature of one party renders an agreement unenforceable). As a result, any settlement agreement reached between the parties was unenforceable.

¶ 37 III. CONCLUSION

¶ 38 In conclusion, the trial court erred in granting the motion of BWA and the Maynard guarantors to enforce the settlement agreement because that agreement failed to comport with the Credit Act and, as a result, was unenforceable. Accordingly, we reverse and remand for the trial court to resolve the remaining issues before it, primarily Harris's motion for summary judgment.

¶ 39         For the foregoing reasons, we reverse and remand.

¶ 40         Reversed and remanded.